CITY OF HOUSTON and Susan
McMillian, in her individual
capacity, Appellants,

v.

Juanita FLETCHER, Appellee.

No. 11–03–00200–CV.

Court of Appeals of Texas,
Eastland.

June 9, 2005.

Rehearing Overruled July 28, 2005.

Eliot P. Tucker, Roy L. Barnes, Tucker/Vaughan, Donald J. Fleming, Senior Asst. City Atty., Houston, for appellants.

Joyce Keating, Law Firm of Joyce A. Keating, Houston, for appellee.

Panel consists of: ARNOT, C.J., and WRIGHT, J., and McCALL, J.

## Opinion

TERRY McCALL, Justice.

Juanita Fletcher brought this action against her former employer, the City of Houston, and her former supervisor, Susan McMillian. Fletcher asserted age discrimination claims against the City under the Texas Commission on Human Rights Act (TCHRA). TEX. LAB. CODE ANN. § 21.001 et seq. (Vernon 1996 & Supp. 2004–2005). She alleged an intentional infliction of emotional distress claim against McMillian. The jury found (1) that the City had subjected Fletcher to a hostile work environment based upon her age, (2) that the City had discriminated against Fletcher based upon her age, and (3) that the City had terminated Fletcher based upon her age. With respect to Fletcher's claims against the City, the jury awarded $90,000.00 in past lost wages, $69,000.00 in diminishment in future wages, and $100,000.00 in past mental anguish damages. The jury also awarded attorney's fees. The jury also found in Fletcher's favor on her intentional infliction of emotional distress claim against McMillian. On the intentional infliction of emotional distress claim, the jury awarded $100,000.00 in compensatory damages and $64,000.00 in exemplary damages. The trial court entered judgment in accordance with the jury's verdict. The City and McMillian appeal the judgment. For the reasons stated, we modify the trial court's judgment against the City and affirm the judgment as modified, and we reverse the trial court's judgment against McMillian and render judgment that Fletcher take nothing on her claims against McMillian.

### Issues Presented

The City presents five issues for review. The City argues (1) that the trial court erred by submitting an improper instruction to the jury on Fletcher's hostile work environment claim, (2) that the evidence was legally and factually insufficient to support the jury's finding that the City subjected Fletcher to a hostile work environment based on age, (3) that the evidence was legally and factually insufficient to support the jury's finding that the City subjected Fletcher to discriminatory treatment based on age, (4) that the evidence was legally and factually insufficient to support the jury's finding that Fletcher's age was a motivating factor in the City's decision to discharge her, and (5) that the trial court erred in awarding an improper amount of prejudgment interest and postjudgment interest in the judgment.

McMillian presents six issues for review. McMillian argues (1) that the trial court erred in determining that she engaged in conduct that would support a claim for intentional infliction of emotional distress, (2) that the evidence was legally and factually insufficient to support a finding that she committed extreme and outrageous conduct, (3) that the evidence was legally and factually insufficient to support a finding that Fletcher suffered severe emotional distress, (4) that Fletcher may not pursue a claim for intentional infliction of emotional distress—which is a "gap-filler" remedy—because she has an adequate remedy for age discrimination, (5) that the trial court erred in awarding Fletcher a double recovery by awarding Fletcher damages on her age discrimination claim and her intentional infliction of emotional distress claim, and (6) that the trial court erred in awarding exemplary damages against her.

### The Evidence

Fletcher was employed by the City from September 3, 1996, until May 30, 1997. She was an Administrative Assistant III in the City's Department of Public Works & Engineering, Traffic Management & Main-

tenance Division. She was 53 years old when she began her employment with the City. Fletcher's supervisor was McMillian. McMillian was 48 years old when Fletcher began her employment with the City. The City terminated Fletcher for the stated reasons of unsatisfactory service during her probationary period and insubordination.

### Testimony of Fletcher

Fletcher said that, during her employment with the City, McMillian called her "incompetent," a "stupid old woman," an "old woman," and "senile." She said that McMillian verbally abused her and screamed and yelled at her. McMillian called her a "stupid old woman" several times. Most of McMillian's comments were behind closed doors, but McMillian would come to her desk and "ream" her out and yell at her. McMillian told her that the younger employees were much better than she was. McMillian treated younger employees better than she treated older employees. On occasion, other City employees were present when McMillian yelled at her or called her "stupid" or "stupid old woman." Fletcher's "day-to-day dealings" with McMillian included McMillian's "litany" that "you were stupid, you were senile, you were old, you were incompetent." McMillian was demeaning and rude, treated Fletcher like she was nothing, and treated Fletcher that way every day.

McMillian would not allow Fletcher to do a number of the functions listed on the job description for her Administrative Assistant III job. Fletcher learned very early on that the actual job was not going to be what she thought it would be. McMillian basically told her that she was a clerk. McMillian did not give her access to information that would have permitted her to do the job. McMillian denied her training that was necessary to do her job. McMillian would not allow her to attend city council meetings or neighborhood traffic meetings. Without access to this type of information, she could not obtain information necessary to do her job. McMillian told her that she was totally incompetent and that training would not do any good. Angelo John Santopolo and Mary Nola Miles—also employees over 40 years of age—were not allowed to do the jobs that they were hired to perform.

McMillian gave Fletcher substandard ratings in her seven-month Employee Performance Evaluation (EPE). Fletcher told McMillian that she did not have any training and that the EPE did not bear any relevance to the job that she was hired to do. McMillian said that there was nothing Fletcher could do to improve her performance. Fletcher was frustrated and worried about the evaluation. McMillian permitted her to look for another position with the City. McMillian's treatment of Fletcher did not change after the performance review. Fletcher was frightened and upset and did not know whether she was going to be able to keep her job.

On May 14, 1997, McMillian approached Fletcher and asked her if she would come to an EPE meeting. By then, Fletcher had contacted the EEOC[1] and an attorney because of the discriminatory environment at work. Fletcher wanted to call her attorney before going to the EPE. She told McMillian that she could attend the meeting after making a phone call or two. McMillian asked her whether she was being insubordinate, and Fletcher responded that she was not. McMillian let her make the call only after verbally abusing her and screaming at her. After making the call, she told McMillian that she was ready to

---

1. Equal Employment Opportunity Commission.

go to the EPE. McMillian told her that it had been cancelled.

On that same day, McMillian told Fletcher that she was not allowed to receive any phone calls at work. Earlier, Fletcher had told McMillian that she had a daughter who was ill at home and that her daughter might need to contact her. McMillian told Fletcher that Miles could take Fletcher's calls and let Fletcher know about them. After Fletcher learned that she had not received two messages from her daughter in a timely manner, she broke down and started crying. Fletcher got permission from McMillian to go home. When she got home, she learned that her daughter had passed out that morning and, after coming to, had tried to call her at work. Fletcher testified that her daughter could have died that morning.

Fletcher went to work the next day. Shortly after arriving at work, she was placed on administrative leave. Fletcher submitted her resignation at the end of the month. McMillian and two men came to her house. She would not let them in because she was afraid of them. The City terminated Fletcher's employment before her resignation became effective.

Fletcher considered consulting a physician or a psychologist because of the stressful situation at work. She went to an appointment with her daughter's therapist, but she could not afford formal counseling. She talked to her pastor about the emotional problems that she was having as a result of McMillian's conduct. Fletcher was depressed, could not eat or sleep, had violent migraines, had asthma attacks, and was constantly coughing.

*Testimony of Santopolo, Ukaegbu, Husain, Harris, Cox, and Van Manen*

Santopolo was a former City employee who had worked with Fletcher. Fletcher was being ordered to do a very different job than that of her job title. Fletcher basically just sat at her desk and did nothing more than make copies. Fletcher was not allowed to answer the telephone. Santopolo heard McMillian yell at Fletcher, call her a "stupid old woman," and tell her that she was "incompetent." He recalled McMillian calling Fletcher a "stupid old woman" two or three times. Every few days, Fletcher would come into his office crying. Santopolo and others listened to her and consoled her.

Samson Ukaegbu worked for the City from June 1996 until June 1998. Ukaegbu testified that Fletcher was the division secretary. Fletcher came into his office once or twice crying. Fletcher told him that McMillian had talked to her in an unprofessional manner. He never heard McMillian use the expression "stupid old woman."

Naeem Husain worked in the City's traffic management department. Husain testified that he heard McMillian and Fletcher arguing on one occasion. Fletcher was very professional and capable of doing any kind of work.

Jack A. Harris was the operations director of Professional Career Advantage. Harris testified that he counseled people; advised them on career moves; and determined whether a job would be appropriate for them based upon their experience, talents, and abilities. Fletcher came to his firm in 1996 for career assistance. He considered her to be very bright and sharp, and he thought that she had a lot of talent. Fletcher wanted to know how to get back into the work force. Fletcher was interested in an administrative assistant job with the City. Harris examined Plaintiff's Exhibit No. 4, which was the City's posting for Fletcher's Administrative Assistant III job. He considered the job to be a professional type of position. He said that it did not make sense for the

City to post a job describing a much higher level of functions if it only wanted a clerk. After Fletcher got the job with the City, she contacted him several times, expressing her concerns that she was not being sufficiently challenged. Harris did not expect anyone to be able to walk into a department and assume all of the responsibilities of the job. Fletcher had the capabilities and background necessary to assume the responsibilities listed on the job posting. It would take a level of commitment or time to master the functions. The job posting was not for an office manager position but was for an administrative assistant.

David Cox worked for the City for 16 years. He testified that he started as an Administrative Assistant III. Job postings should be very specific and accurate. The job posting for Fletcher's job called for a professional rather than a clerk. The posting was not for a clerical type of job. Fletcher was being asked to do clerical duties that were inconsistent with the original job posting.

Steve Van Manen testified that he is a Certified Public Accountant in Victoria, Texas. He provided testimony on Fletcher's alleged damages.

*Testimony of McMillian*

McMillian testified that she controlled the neighborhood Traffic Calming Section. She was part of the three-person panel that interviewed Fletcher for the Administrative Assistant III job. They were looking for somebody with compositional skills, writing skills, and organizational skills. The panel recommended Fletcher for the job. McMillian thought that the person selected for the job could have grasped the basics of the job within six to eight weeks. Fletcher did not reach the level of proficiency that she expected Fletcher to reach.

McMillian testified that she never called Fletcher "old," "stupid old woman," "senile," or "incompetent." At times, she was very impatient toward Fletcher. She did not recall raising her voice when it came to dealing with Fletcher, but she stated that she might have.

McMillian criticized Fletcher's general lack of program knowledge. Employees needed to know policies and procedures. Fletcher's job initially was to familiarize herself with the program and develop an understanding of the program so that she could apply policy at some point. Fletcher had access to data necessary to learn the program. McMillian did not deny computer training to Fletcher. McMillian restricted all employees' abilities to attend meetings. Only essential personnel attended the meetings. McMillian did not allow Fletcher to attend city council meetings or neighborhood traffic meetings because Fletcher's presence was not essential to the meetings.

McMillian performed Fletcher's five-month EPE. Fletcher rated unacceptable in many areas. Fletcher had made errors that revealed a serious lack of program knowledge. McMillian suggested to Fletcher that she upgrade her computer skills and program knowledge. Fletcher's understanding of the program and ability to find information in the files was deficient. McMillian thought that Fletcher might improve by gaining an understanding of program details. McMillian suggested that Fletcher obtain a better understanding of all program details and the computer database. Fletcher was unable to interpret and disseminate policies and information. McMillian suggested that Fletcher study the policy book that was kept in her office. Fletcher's employee rating was 1.10, which was unacceptable. A rating between 3.0 and 3.6 was an "effective" rating. During the EPE, Fletcher did not give McMillian any indication that she was unhappy with the position.

McMillian suggested that Fletcher look for other job opportunities with the City.

On May 14, 1997, McMillian asked Fletcher to accompany her to Mark Lupher's office for an EPE. Fletcher asked her if she could make a call, and she gave Fletcher permission to make the call. Fletcher made several calls. The EPE was not performed because Fletcher refused to come to the meeting. McMillian told Fletcher that the EPE could not be done because Lupher had to leave the building. Fletcher received a rating of 1.05 in the EPE. Later that day, Fletcher could not stop crying and needed to leave. Fletcher's calls were forwarded to another employee on that day.

On May 15, 1997, Fletcher was put on relief of duty with pay. Fletcher's calls were forwarded to another employee. McMillian recommended that the City terminate Fletcher's employment. When Fletcher was placed on relief of duty with pay, McMillian's recommendation for termination was working its way up the chain of command. The City terminated Fletcher, effective May 30, 1997. Fletcher was terminated for refusing to follow a directive, insubordination, and poor work performance.

*Testimony of Miles, Garcia, Drabek, Rolen, Krenek, and Steward*

Miles was an Administrative Assistant II in the Traffic Calming Section. Miles testified that McMillian never did anything to humiliate or demean Fletcher. Miles never heard McMillian call Fletcher a "stupid old woman." Fletcher felt like she was hired to do something different from the job that she actually was performing. On May 14, 1997, Fletcher refused to go to the EPE with McMillian and was very upset.

Maria Garcia was an Administrative Assistant II in the Traffic Calming Section. She testified that she did not give Fletcher orders and that Fletcher "bucked heads" with McMillian. It was not easy to work with Fletcher. Garcia never heard McMillian criticize or degrade Fletcher or call Fletcher a "stupid old woman" or "senile."

Gary Drabek was employed by the City as a Planner in the Traffic Calming Section. He testified that he heard Fletcher raise her voice at times. Fletcher had difficulties with understanding the programs. She had problems with accessing information in the database. Drabek never heard McMillian call Fletcher "stupid" or a "stupid old woman." He never heard McMillian yell or shout at anybody.

Thomas J. Rolen was a Deputy Director in the City's Public Works Department when Fletcher worked for the City. Rolen testified that McMillian made the recommendation to place Fletcher on relief of duty with pay. McMillian told the facts supporting the recommendation to Lupher, and Lupher told the facts to him. Rolen reviewed the facts that Lupher reported to him. Rolen signed the relief of duty with pay notification that was given to Fletcher. McMillian made the recommendation that Fletcher's employment be terminated. Rolen agreed with the recommendation; and Jimmie Schindewolf, the Director of the Public Works Department, made the ultimate decision to terminate Fletcher's employment. Fletcher had provided unsatisfactory service during her probationary period and refused to follow directives, an insubordination.

Eddie Michael Krenek, an attorney representing the City in this case, testified on behalf of the City. He testified on attorney's fees issues.

Dwight Steward, an economist, also testified on behalf of the City. He testified about Fletcher's alleged damages.

*Standards of Review*

The City's second, third, and fourth issues and McMillian's second and third issues attack the legal and factual sufficiency of the evidence. Fletcher had the burden of proof on the challenged issues and obtained favorable jury findings on those issues. Consequently, to address the City's and McMillian's legal sufficiency/no-evidence challenge, we must consider only the evidence and inferences that tend to support the finding, disregarding any evidence or inferences to the contrary. *Southwest Key Program, Inc. v. Gil–Perez*, 81 S.W.3d 269, 274 (Tex.2002); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965); *see Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997), *cert. den'd*, 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998). We may sustain a no-evidence challenge only when (1) the record discloses a complete absence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the only evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharmaceuticals, Inc. v. Havner, supra* at 711 (citing *Robert W. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEXAS L. REV. 361, 362–63 (1960)). If there is any evidence of probative force to support the finding, we must overrule the no-evidence point. *Juliette Fowler Homes, Inc. v. Welch Associates, Inc.*, 793 S.W.2d 660, 666 (Tex. 1990); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

In reviewing the factual sufficiency challenges to the jury's findings, we must consider all of the evidence and determine whether the evidence in support of the findings is so weak as to be clearly wrong and manifestly unjust or whether the findings are so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Dow Chemical Company v. Francis*, 46 S.W.3d 237, 242 (Tex.2001); *Pool v. Ford Motor Company*, 715 S.W.2d 629 (Tex.1986); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Ellis v. City of Dallas*, 111 S.W.3d 161, 164 (Tex.App.-Eastland 2003, no pet'n). We cannot reverse merely because we conclude that a preponderance of the evidence supports the opposing answer and cannot substitute our opinion for that of the trier of fact and determine that we would have reached a different conclusion. *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex.1988). The fact finder is the sole judge of the credibility of the witnesses and the weight to be given their testimony and resolves any inconsistencies in the testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex.1986). The jury may believe one witness and disbelieve others. *McGalliard v. Kuhlmann, supra* at 697.

*Hostile Work Environment*

In its first issue, the City argues that the trial court erred by submitting an improper instruction to the jury on Fletcher's hostile work environment claim. In its second issue, the City argues that the evidence was legally and factually insufficient to establish that the City subjected Fletcher to a hostile work environment based on her age.

The TCHRA prohibits an employer from discharging or in any other way discriminating against an employee because of the employee's age. Section 21.051; *Wal–Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex.2003). The legislature intended to correlate state law with federal law in employment discrimination cases when it enacted the TCHRA. *Wal–Mart Stores, Inc. v. Canchola, supra;*

*NME Hospitals, Inc. v. Rennels,* 994 S.W.2d 142, 144 (Tex.1999). Texas state courts have not addressed whether an age-based hostile work environment claim is available under the TCHRA. Therefore, we examine federal case law on the issue of age-based hostile work environment claims. The Fifth Circuit has not addressed whether a hostile work environment claim is available under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq. However, other circuits have recognized that a hostile work environment claim is actionable under the ADEA. *Brennan v. Metropolitan Opera Association, Inc.,* 192 F.3d 310, 318 (2nd Cir.1999); *Crawford v. Medina General Hospital,* 96 F.3d 830, 834 (6th Cir. 1996). Likewise, federal courts in the Northern District of Texas have recognized that such a claim exists. *Lacher v. West,* 147 F.Supp.2d 538, 542–43 (N.D.Tex. 2001); *see also Scally v. Burlington Northern & Santa Fe Railway Company,* No. 4:00–CV–1849–A, 2001 WL 1577626 (N.D.Tex.2001). Based on the reasoning of these courts, we find that an age-based hostile work environment claim is actionable under the TCHRA.

■ The elements of an age-based hostile work environment claim are as follows: (1) the employee belongs to a protected group (40 years old or older); (2) the employee was subject to unwelcome harassment; (3) the harassment complained of was based upon age; (4) the harassment complained of affected a "term, condition or privilege of employment," i.e., the harassment must be sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment; (5) respondeat superior, i.e., that the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *See Lacher v. West, su-*

*pra* at 543; *see also Watts v. Kroger Company,* 170 F.3d 505, 509 (5th Cir.1999); *Crawford v. Medina General Hospital, supra* at 834–35 (setting forth elements of sexual harassment hostile work environment claim). However, employees bringing a hostile work environment case, such as in this case, alleging that a supervisor with immediate (or successively higher) authority over the employee harassed the employee need only satisfy the first four elements of the test outlined above. *Watts v. Kroger Company, supra; Lacher v. West, supra.*

■ To be actionable, the work environment must be both objectively and subjectively offensive—one that a reasonable person would find hostile or abusive and one that the victim in fact did perceive to be so. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Crawford v. Medina General Hospital, supra* at 835. Courts determine whether an environment is sufficiently abusive to be actionable by reviewing all of the relevant circumstances, including the frequency of the conduct, its severity, whether it is physically threatening or humiliating or it is a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance. *Butler v. Ysleta Independent School District,* 161 F.3d 263, 269 (5th Cir.1998)(citing *Faragher v. City of Boca Raton, supra* at 787–88, 118 S.Ct. 2275); *Nash v. Electrospace System, Inc.,* 9 F.3d 401, 403–04 (5th Cir.1993). Incidental or occasional age-based comments, discourtesy, rudeness, or isolated incidents (unless extremely serious) are not discriminatory changes in the terms and conditions of a worker's employment. *Butler v. Ysleta Independent School District, supra* at 269 n. 3 (citing *Faragher v. City of Boca Raton, supra* 524 U.S. at 788, 118 S.Ct. 2275).

Even when a hostile environment is shown, the plaintiff must establish that the workplace environment had the effect of altering the terms and conditions of his employment. *Lacher v. West, supra* at 544 (citing *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Central to the court's inquiry into a hostile environment claim is whether the alleged harasser's actions have undermined the victim's workplace competence, discouraged him from remaining on the job, or kept him from advancing in his career. *Lacher v. West, supra* (citing *Harris v. Forklift Systems, Inc., supra* 510 U.S. at 22, 114 S.Ct. 367; *Shepherd v. Comptroller of Public Accounts,* 168 F.3d 871, 874 (5th Cir.), *cert. den'd,* 528 U.S. 963, 120 S.Ct. 395, 145 L.Ed.2d 308 (1999); *Butler v. Ysleta Independent School District, supra* at 270). The availability of a hostile work environment claim is intended to prohibit and prevent conduct "that is so severe and pervasive that it destroys a protected class member's opportunity to succeed in the workplace." *Lacher v. West, supra* at 544 (citing *Shepherd v. Comptroller of Public Accounts, supra; Weller v. Citation Oil & Gas Corporation,* 84 F.3d 191, 194 (5th Cir.1996), *cert. den'd,* 519 U.S. 1055, 117 S.Ct. 682, 136 L.Ed.2d 607 (1997)). The law's overall goal of equality is not served if a claim can be maintained solely based on conduct that wounds or offends, but does not hinder an employee's performance. *Lacher v. West, supra* (citing *Weller v. Citation Oil & Gas Corporation, supra* at 194).

The trial court submitted the following issue and instructions on Fletcher's hostile work environment claim:

> Do you find that the City of Houston created a hostile work environment in relation to Juanita Fletcher based upon her age?

Age discrimination may also be shown by the creation of a hostile work environment. A hostile work environment is shown when: (1) a supervisor (2) because of age (3) subjects an employee to (4) unwelcome conduct (5) that is severe and pervasive, (6) creates an abusive work environment, and (7) affects a term, condition, or privilege of employment.

Certain factors can be considered in assessing whether a work environment is hostile or abusive: the frequency and severity of the abusive conduct, whether the conduct was physically threatening or humiliating, and whether the conduct unreasonably interfered with the plaintiff's work performance. You must determine from all the circumstances whether a reasonable person would find the environment hostile or abusive, provided the plaintiff personally and subjectively perceived the environment to be abusive. A showing of "tangible psychological injury" is not required.

The City contends that the seven-element hostile work environment instruction set forth above was improper and an incorrect statement of the law. We review a jury charge under an abuse of discretion standard. *Texas Department of Human Services v. E.B.,* 802 S.W.2d 647, 649 (Tex.1990). An abuse of discretion occurs only when the trial court acts without reference to any guiding principle. *Texas Department of Human Services v. E.B., supra.* Pursuant to TEX.R.CIV.P. 277, a trial court is required to submit "such instructions and definitions as shall be proper to enable the jury to render a verdict." Trial courts are afforded considerable discretion in deciding what instructions are necessary and proper in submitting issues to the jury. *State Farm*

*Lloyds v. Nicolau,* 951 S.W.2d 444, 451 (Tex.1997). For an instruction to be proper, it must (1) assist the jury, (2) accurately state the law, and (3) find support in the pleadings and the evidence. *Texas Workers' Compensation Insurance Fund v. Mandlbauer,* 34 S.W.3d 909, 912 (Tex. 2000).

In this case, the trial court's instruction accurately stated the elements of a hostile work environment claim. *See Wal–Mart Stores, Inc. v. Itz,* 21 S.W.3d 456, 472 (Tex.App.-Austin 2000, pet'n den'd)(setting forth elements of a hostile work environment claim based on sexual harassment). Viewed in their entirety, the trial court's hostile environment instructions accurately stated the law in accordance with the authorities cited above. *See Watts v. Kroger Company, supra* at 509; *Crawford v. Medina General Hospital, supra* at 834–35; *Lacher v. West, supra* at 543. The trial court did not act without reference to any guiding principle. Therefore, the trial court did not abuse its discretion in submitting its instructions on Fletcher's hostile work environment claim. The City's first issue is overruled.

 The City contends that the evidence was legally and factually insufficient to support the jury's hostile work environment finding. Fletcher testified that McMillian screamed and yelled at her. She said that McMillian called her "incompetent," a "stupid old woman," an "old woman," and "senile." Fletcher said that the abuse was part of McMillian's litany that "you were stupid, you were senile, you were old, you were incompetent." She said that the abuse was part of her "day-to-day" dealings with McMillian. Santopolo said that he heard McMillian yell at Fletcher and call her a "stupid old woman" two or three times. He also heard McMillian tell Fletcher that she was "incompetent." Fletcher said that McMillian told

her that younger employees were so much better than she was. Santopolo and Ukaegbu said that Fletcher came into their offices crying after McMillian had talked to her. McMillian denied that she ever called Fletcher any of the above names. However, the jury, as the sole judge of the credibility of the witnesses, could have believed Fletcher and disbelieved McMillian. *McGalliard v. Kuhlmann, supra* at 697.

Fletcher said that McMillian frightened her and upset her. She said that McMillian treated her like she was nothing. She said that she became depressed; that she could not eat or sleep; and that she had violent migraines, asthma attacks, and constant coughing. Fletcher received unacceptable performance reviews from the City. The jury could have concluded that the harassment interfered with Fletcher's ability to do her job, undermined her workplace competence, and hindered her performance.

We hold that the evidence was both legally and factually sufficient to support the jury's hostile work environment finding. Based on the evidence, the jury could have concluded that Fletcher was subjected to severe and pervasive harassment and that the harassment altered the conditions of her employment and created an abusive environment.

The City's second issue is overruled. In light of our disposition of the City's second issue, we need not address the City's third and fourth issues. TEX.R.APP.P. 47.1.

### Intentional Infliction of Emotional Distress

 To recover on an intentional infliction of emotional distress claim, a plaintiff must establish the following elements: (1) that the defendant acted intentionally or recklessly; (2) that the defendant's conduct was extreme and

outrageous; (3) that the defendant's actions caused the plaintiff emotional distress; and (4) that the resulting emotional distress was severe. *Hoffmann La Roche, Inc. v. Zeltwanger,* 144 S.W.3d 438, 445 (Tex.2004); *GTE Southwest, Incorporated v. Bruce,* 998 S.W.2d 605, 611 (Tex.1999). Extreme and outrageous conduct is conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hoffmann La Roche, Inc. v. Zeltwanger, supra* at 445 (quoting *Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex.1993) (quoting *Restatement (Second) of Torts* § 46 cmt. d (1965))). Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *Hoffmann La Roche, Inc. v. Zeltwanger, supra.*

A claim for intentional infliction of emotional distress does not lie for ordinary employment disputes. *GTE Southwest, Incorporated v. Bruce, supra* at 612. To establish an intentional infliction of emotional distress claim, an employee must prove the existence of some conduct that brings the dispute outside the scope of an ordinary employment dispute and into the realm of extreme and outrageous conduct. *GTE Southwest, Incorporated v. Bruce, supra* at 613. Such extreme conduct exists only in the most unusual of circumstances. *GTE Southwest, Incorporated v. Bruce, supra.*

It is for a court to determine, in the first instance, whether a defendant's conduct was extreme and outrageous. *Hoffmann La Roche, Inc. v. Zeltwanger, supra.* But when reasonable minds may differ, it is for the jury, subject to the court's control, to determine whether, in the particular case, the conduct was suffi-

ciently extreme and outrageous to result in liability. *Hoffmann La Roche, Inc. v. Zeltwanger, supra.*

Fletcher states in her brief that "McMillian spent eight months engaged in a relentless and abusive pattern of degrading, threatening, and humiliating conduct towards Fletcher that went well beyond a mere employment dispute." In part, Fletcher relies on the following evidence to support her claim that McMillian's conduct was extreme and outrageous: (1) that McMillian engaged in daily, humiliating verbal confrontations, insults, and name-calling against Fletcher such as calling her stupid, senile, and incompetent; (2) that McMillian often screamed at her in front of other employees; (3) that McMillian, while knowing that Fletcher's daughter was very ill at home, did not allow Fletcher to receive phone calls at work but, rather, transferred Fletcher's phone line to another employee's phone line; (4) that McMillian demoted Fletcher; (5) that McMillian took away her job duties and made her perform menial tasks; (6) that McMillian permitted younger employees to give her orders; (7) that McMillian permitted younger, less-qualified employees to perform her job duties; (8) that McMillian imposed overly burdensome reporting requirements on her; (9) that McMillian refused to allow her to attend key meetings or to conduct field work necessary to do her job; (10) that McMillian did not allow her to receive essential e-mail communications; and (11) that McMillian prohibited her, but not others, from communicating with persons in other departments in the City.

We find that the evidence was legally insufficient to support a finding that McMillian engaged in extreme and outrageous conduct. Fletcher did not "prove the existence of some conduct that brings the dispute outside the scope of an ordi-

nary employment dispute and into the realm of extreme and outrageous conduct." *GTE Southwest, Incorporated v. Bruce, supra* at 613. This case is nothing like the employees' "den of terror" that existed in *Bruce.* Fletcher argues that the denial of telephone access to her ill child took this case out of the realm of an ordinary employment dispute. However, the evidence showed that Fletcher's phone line was transferred to another employee's line and that the other employee could give phone messages to Fletcher. The transferring of the phone calls did not constitute extreme and outrageous conduct. Likewise, McMillian's name-calling of Fletcher did not rise to the level of extreme and outrageous conduct. *See Union Pacific Railroad Company v. Loa,* 153 S.W.3d 162, 170–72 (Tex.App.-El Paso 2004, no pet'n).

McMillian's first issue is sustained. Therefore, we need not address McMillian's other issues. Rule 47.1.

### Interest Issues

■ In its fifth issue, the City complains that the trial court erred in awarding an improper amount of prejudgment interest in the judgment. The City also argues that the judgment contains an excessive rate of postjudgment interest. The trial court awarded Fletcher prejudgment interest on the $259,000.00 in actual damages found by the jury. The following awards made up the $259,000.00 amount: (1) $90,000.00 in past lost wages; (2) $69,000.00 in diminishment in future wages; and (3) $100,000.00 in past mental anguish damages. The trial court awarded prejudgment interest and postjudgment interest at the rate of 10 percent per annum.

■ The City argues that Fletcher was not entitled to recover prejudgment interest because she failed to plead a claim for prejudgment interest. Fletcher's age dis-

crimination claims against the City were based on the TCHRA. A plaintiff is not required to plead a claim for prejudgment interest when the claim is based on statute; a prayer for general relief will support an award of prejudgment interest for statutory claims. *Ralston Purina Company v. McKendrick,* 850 S.W.2d 629, 638 (Tex.App.-San Antonio 1993, writ den'd)(citing *Benavidez v. Isles Construction Company,* 726 S.W.2d 23, 25 (Tex. 1987)). Fletcher's prayer for general relief supported her claim for prejudgment interest.

■ The City also argues that the trial court erred in awarding Fletcher prejudgment interest on her recovery of $90,000.00 in past lost wages. However, an award of prejudgment interest on past lost wages is proper under the TCHRA. *City of Austin v. Gifford,* 824 S.W.2d 735, 743 (Tex.App.-Austin 1992, no writ).

■ The City also argues that the trial court erred in awarding prejudgment interest to Fletcher on her future damages—$69,000.00 in diminishment in future wages. An award of prejudgment interest on Fletcher's future lost wages was improper. *Gorges Foodservice, Inc. v. Huerta,* 964 S.W.2d 656, 672–73 (Tex.App.-Corpus Christi 1997, no pet'n). The trial court erred in awarding prejudgment interest on Fletcher's future economic damages. *Gorges Foodservice, Inc. v. Huerta, supra.*

■ The City also argues that the trial court erred in awarding postjudgment interest at the rate of 10 percent per annum. The City contends that a 2003 amendment to TEX. FIN. CODE ANN. § 304.003(c) (Vernon Supp.2004–2005) that lowered the minimum postjudgment interest rate from 10 percent to 5 percent applies in this case.

In 2003, the legislature amended Section 304.003(c) to reduce the postjudgment in-

terest rate from 10 percent to 5 percent in two different bills (Tex.H.B.4, 78th Leg., R.S. (2003) and Tex. H.B. 2415, R.S. (2003)). The amendments had different effective dates—June 20, 2003, and September 1, 2003. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 6.01, 2003 Tex. Gen. Laws 847, 862. (effective date Sept. 1, 2003); *see also* Act of June 1, 2003, 78th Leg., R.S., ch. 676, § 1, 2003 Tex. Gen. Laws 2096, 2096–97 (effective date June 20, 2003). Each bill provided that the changes in the law applied in cases "in which a final judgment is signed or subject to appeal on or after the effective date of this Act." *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 6.04, 2003 Tex. Gen. Laws 847, 862; *see also* Act of June 1, 2003, 78th Leg., R.S., ch. 676, § 2(a), 2003 Tex. Gen. Laws 2096, 2097.

We assume, without deciding, that the effective date of the amendment was June 20, 2003, the earlier of the effective dates. The trial court signed the judgment in this case on March 31, 2003; and the judgment disposed of all issues and parties. Thus, the judgment was signed and subject to appeal before the effective date of the amendments. *City of Dallas v. Redbird Development Corporation,* 143 S.W.3d 375, 388–89 (Tex.App.-Dallas 2004, no pet'n); *In re Kajima International, Inc.,* 139 S.W.3d 107, 113–17 (Tex.App.-Corpus Christi 2004, orig. proceeding); *Columbia Medical Center of Las Colinas v. Bush,* 122 S.W.3d 835, 864–66 (Tex.App.-Fort Worth 2003, pet'n den'd). Therefore, Section 304.003(c), as amended in 2003, does not apply in this case. *City of Dallas v. Redbird Development Corporation, supra* at 389; *In re Kajima International, Inc., supra; Columbia Medical Center of Las Colinas v. Bush, supra.* The trial court did not award an excessive rate of post-judgment interest.

We, therefore, sustain the City's fifth issue to the extent that the City complains of the trial court's award of prejudgment interest on Fletcher's recovery of $69,000.00 in diminishment of future earnings. The trial court awarded prejudgment interest in the amount of $119,423.83 on Fletcher's recovery of $259,000.00 in actual damages against the City. The rate of prejudgment interest was $70.96 per day. The trial court should have awarded prejudgment interest on the amount of $190,000.00 ($259,000.00—$69,000.00), at the rate of $52.05 per day. Therefore, the prejudgment interest awarded in the judgment is reduced from $119,423.83 to $87,652.20.

### This Court's Ruling

The paragraph in the trial court's judgment awarding prejudgment interest on Fletcher's recovery of damages from the City is modified to read as follows:

It is further ORDERED, ADJUDGED, and DECREED that Plaintiff Juanita Fletcher have and recover of and from Defendant City of Houston the sum of $87,652.20 as prejudgment interest on the amount of $190,000.00 of her actual damages ($90,000.00 in past lost wages plus $100,000.00 in past mental anguish) calculated at the rate of 10% per annum from August 4, 1998 (180 days after suit is filed) until March 15, 2003 (1,684 days). For each day that accrues after March 15, 2003, until the date of this Judgment, prejudgment interest shall accrue at the rate of $52.05 per day, for which amount Plaintiff Juanita Fletcher shall have and recover of and from Defendant City of Houston.

The trial court's judgment in favor of Fletcher against the City is affirmed as modified by this opinion. The trial court's judgment in favor of Fletcher against McMillian is reversed, and judgment is

rendered that Fletcher take nothing by her claims against McMillian.