NO. 07-09-0379-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

DECEMBER 28, 2011
_____

FOURTH & FRANKFORD SONIC, LTD.,
A TEXAS CORPORATION,

                                                        Appellant
v.

CHELSEA BROWN,

                                                        Appellee
_____

FROM THE 72ND DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2007-541,586; HONORABLE RUBEN GONZALES REYES, PRESIDING
_____

*Memorandum Opinion*
_____


Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

Chelsea Brown sued her former employer, Fourth & Frankford Sonic, Ltd., and recovered judgment in her favor. Her myriad complaints arose from her being victimized by a co-worker, Eugene Houston, while working. Only one claim was submitted to the jury, however, and it consisted of sexual harassment. As previously mentioned, the jury found in favor of her on that claim. Sonic appeals by asserting that there was neither legally nor factually sufficient evidence to support the finding. It also

questions whether the amount of attorney's fees awarded Brown was excessive since she failed to segregate recoverable fees from unrecoverable ones. Brown appeals and contends that the trial court should not have directed a verdict on her claim of battery and should have awarded her more attorney's fees. We affirm in part, reverse in part and remand.

*Background*

During portions of 2005 and 2006, Brown and Houston were employees of Sonic. She was a carhop, and he worked primarily as a cook. But, according to the testimony of a Sonic limited partner, Houston was classified a "manager-in-training," which was a position "superior to a carhop." Furthermore, his duties included accounting for revenue received by carhops from food sales. But whatever else they encompassed went unexplained.

Brown testified of four workplace occurrences which she contends created a hostile work environment and, therefore, constituted sexual harassment. The first occurred at Sonic in late August or early September 2005, was described as Houston attempting to "spoon" with Brown. When she asked him not to touch her,

> he said, 'Well, I'm just being friendly.' And I said, 'You don't have to touch me to be friendly.' And I said, 'I'm married.' And he said, 'Well, I didn't ask you that.' And that's it.

Brown immediately reported the occurrence to an assistant manager on duty, Curt Bluhm.

The next unwelcomed advance toward Brown arose during an evening shift in October 2005. According to her testimony, she

2

. . . was standing there, and Trey--I don't know his last name, but Trey was counting my money, and I felt somebody come up from behind me and rub up my neck and went into my hair and went down my back slowly. And then I turned and looked, and I seen it was him. And I told him, 'Quit touching me like that.' And he said--he didn't say anything, and he just walked off.

\* \* \*

Q. How far down your back did he move his hand?

A. He went to the middle of my back.

Furthermore, her "boyfriend," who was parked outside, witnessed the event. And, as before, she immediately reported it to the assistant manager on duty, Zane Pogue. The assistant manager purportedly laughed at the report and said he would talk to Houston. The following day, a female co-worker laughingly said to Brown that Houston was in trouble. Moreover, when a male carhop accidentally bumped into her that day, the assistant manager admonished the male carhop that Brown's "boyfriend might beat you up."

The next incident happened in November 2005 during an afternoon shift while Brown was carrying a food tray. She described it as follows:

I had turned around to take out an order, and when I turned around, [Houston] came up behind me and put his arm around my shoulder, and he put his hand on my arm. And he said, 'I'm going to show you how to do your job.' And I looked at him, and I said, 'You need to go do your job.' And he walked me outside, and I said, 'Get off me.' And he walked me like to two cars. And when I was getting close to the car I was going to, he turned back around and went back inside.

Q. So he pretended like he was escorting you?

A. Yes.

Q. Did he have any business trying to tell you how to do your job?

A. Not to my knowledge, no, he didn't.

3

The following day, Brown reported the occurrence to the general manager, Chris Willson, who agreed to "have a talk" with Houston.

The final advance by Houston occurred during January 2006. Brown was behind the fountain standing beside a female co-worker at the time when she:

> . . . bent over. I was talking to [the co-worker] and I had bent over to get my drink. And as I bent over, I felt somebody rub their hand down my back, you know, all the way to my butt. And I raised up, and he had thumped me on my ear. And I said, 'Why are you touching me like that?' And he said--he said, 'You.' And I said, 'What?' And he said, 'You were the one.' And then he walked off.

On cross-examination, Brown stated that Houston did not touch her "butt" but merely rubbed her back "'all the way to my butt.'" The matter was then reported to a different manager, Mikey Torres, who stated that he would take care of the matter the following day. Houston allegedly was demoted back to cook, though nothing in his personnel file reflects it was because of his intimacies with Brown. Nor do his personnel records reflect that he was ever disciplined for or counseled about his conduct towards Brown despite two superiors supposedly having addressed the matter with Houston.

Brown further testified that the environment at Sonic was not good for her and that she needed to leave. So, she resigned at the end of January 2006.

### Sonic's Issues

Sonic contends that the evidence was legally and factually insufficient to sustain the jury's verdict of sexual harassment and that the attorney's fees awarded Brown were excessive. We address each issue in turn.

*Sexual Harassment -- Insufficient Evidence*

First, the applicable standard of review can be found in *City of Keller v. Wilson,* 168 S.W.3d 802, 809 (Tex. 2005). Applying that standard, we overrule the issue.

4

Section 21.051 of the Texas Labor Code states, in part, that "[a]n employer commits an unlawful employment practice if because of . . . sex . . . the employer . . . discriminates in any other manner against an individual in connection with . . . the terms, conditions, or privileges of employment." TEX. LAB. CODE ANN. §21.051 (Vernon 2006). To recover upon a claim of sexual harassment, one must normally prove 1) he belonged to a protected class; (2) he was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take remedial action. *City of San Antonio v. Cancel*, 261 S.W.3d 778, 784 (Tex. App.–Amarillo 2008, pet. denied); *Septimus v. Univ. of Houston,* 399 F.3d 601, 611 (5th Cir. 2005). Sonic specifically challenges the sufficiency of evidence underlying the second, fourth, and fifth elements mentioned above.

With regard to the second element, the harassment can be of two types, *quid pro quo* or hostile work environment. The latter is what Brown complained of at bar. Thus, she had the burden to prove that her workplace was permeated with discriminatory intimidation, ridicule, and insult of sufficient severity and pervasiveness so as to create a hostile or abusive working environment. *City of San Antonio v. Cancel*, 261 S.W.3d at 785. This standard has both objective and subjective components. That is, it is not enough that the employee subjectively deem the environment hostile, but so too must the proverbial "reasonable person" standing in the complainant's shoes. *See id.* (stating that the work environment must be both objectively and subjectively made hostile or abusive by the discriminatory conduct). And, the totality of the circumstances must be considered in making this assessment. *Id.* Those circumstances include whether or not

5

the misconduct was frequent, was severe, consisted of physical threats or humiliation as opposed to merely offensive utterances, and interfered, unreasonably, with the employee's work performance. *Id.* The critical focus lies on the environment created; so, evidence of the general work atmosphere as well as specific instances of hostility or abuse are important. *Id. citing, Wal-Mart Stores, Inc. v. Itz*, 21 S.W.3d 456, 473 (Tex. App.–Austin 2000, pet. denied).

For example, in *Wal-Mart Stores, Inc. v. Davis*, 979 S.W.2d 30 (Tex. App.–Austin 1998, pet. denied), Davis was a Wal-Mart employee who sued it for maintaining a sexually hostile work environment. Her complaints were directed at her supervisor who uttered such things as liking to see her climb a ladder in a dress, had her climb ladders when she wore a dress, commented that she looked good in jeans, poked her ribs, stood close to her, and grabbed her thighs during two "coaching" sessions. Thereafter, the supervisor purportedly was demoted and transferred to another Wal-Mart location where other females began to complain of his harassment. However, nothing in his personnel file evinced that he was demoted or transferred due to the complaints made by Davis. Nor did it contain any type of reprimand based on the harassment or indication that the transfer or demotion resulted in a reduction of pay or like disciplinary consequence. Due to her complaints, Davis also began to experience repercussions such as employees telling her that they should not talk to her because she would complain about them as well. So too did a rumor spread wherein she was accused of causing her supervisor to be transferred. All this was coupled with evidence that Wal-Mart failed to train their employees about sexual harassment and its avoidance. The

6

foregoing circumstances were enough to support the jury's finding of a sexual harassment claim due to a hostile workplace. *Wal-Mart Stores, Inc. v. Davis*, *supra.*

The circumstances in *Davis* liken to those at bar in many respects. Both involved incidents that were not isolated. Just as those of the co-worker in *Davis*, Houston directed his conduct towards both the complainant and other females.[1] In both, there was physical contact constituting more than mere playful demeanor. Patterson (Davis' supervisor) poked his victim and grabbed her thighs while Houston put his arms around Brown, placed his body against her back and backside as if spooning, and ran his hand down her back to her buttocks as she bent over. Brown's complaints also resulted in the recipient of her first complaint laughing and his later mocking the seriousness of her complaint by admonishing other male employees to avoid contact with Brown in order to avoid being assaulted by her boyfriend.

With regard to maintaining a harassment free environment, Sonic neglected to train its employees in the matter. The same was true in *Davis*. This lack of training apparently extended to management personnel as well. Indeed, those who owned and operated the business could not even decide what Sonic's policy was towards sexual harassment. At least one such owner (Torres) testified that the company maintained a "zero tolerance" policy. It should be noted that this was not true since Houston remained within the employ of Sonic despite his being supposedly counseled by two of his bosses.

Another owner (Wilson) denied the existence of a zero tolerance policy toward sexual harassment. Instead, he implied that some extent of harassment would be

---

[1]Brown testified that Houston and another male employee commented upon a female employee's body and invited the employee to join them after work.

7

tolerated. That the latter's viewpoint appeared the more accurate was borne out by such things as 1) Houston remaining employed despite Brown having complained at least three times to her bosses, 2) management marginalizing Brown's complaints at times, 3) Sonic allowing the transgressor to remain in close physical proximity to his victim, 4) Sonic later informing other prospective employers that Houston was a "good worker" and 5) Sonic omitting from Houston's personnel file any reprimand or reference to his propensity to sexually harass female employees.

Furthermore, that those employing Houston may have opted to treat Houston with leniency cannot be attributed to their having some question about the *bona fides* of Brown's complaints. Wilson not only admitted that Houston never denied them but also acknowledged to management at another Sonic location that Houston had issues necessitating his monitoring, despite his being considered a "good worker."

The comparability between the mindset towards sexual harassment of both Wal-Mart (as exemplified in *Davis)* and Sonic can also be illustrated in another way. As noted by the *Davis* panel, Wal-Mart's management avoided characterizing Patterson's conduct as sexual harassment. The same can be said here. Wilson conceded that Houston's conduct was inappropriate, "not okay," and not an example of "how the store should be run." But, when asked if such things as placing his chest and pelvis against the buttocks and back of a woman (as occurs in "spooning") over the objection of the woman or running his hand down her back to her buttocks as she was bent over had any sexual connotation, Wilson vacillated. It could or could not be in his view, even if such conduct was directed towards his wife or daughter. Much would depend upon whether it was "just goofy behavior," or "a total stranger" did it, or "a friend." But it was

8

not "overtly sexual" in his estimation, though he ultimately conceded that he could "see where it's not welcomed."

Yet, misconduct need not be "overtly" sexual to give rise to a prohibited environment. It is quite conceivable that less than "overt" sexual conduct may also be indicia of a hostile workplace. *See Wal-Mart Stores, Inc. v. Davis*, *supra* (wherein the court cited evidence of spanking a female employee and "wiggling" while sitting atop the lap of another as inappropriate conduct). And, Wilson's apparent willingness to permit an environment comprised of "unwelcomed" advances or inappropriate behavior to exist so long as the conduct was not "overtly sexual" and the culprit is a "good worker" tends to illustrate a misunderstanding of what is acceptable and what is not. Despite Wilson's suggestion to the contrary, a wife, daughter, or female employee need not be required to suffer less than "overt" sexual misconduct simply because it is performed by a "friend" or someone other than a "total stranger."

Admittedly, there is no bright line to be applied in gauging when inappropriate behavior at the workplace becomes actionable**.** *Wal-Mart Stores, Inc. v. Itz,* 21 S.W.3d 456, 463-64 (Tex. App.–Austin 2000, pet. denied) (evidence supported hostile-work-environment claim where, within two-month period, supervisor repeatedly called employee at home in evenings to inquire whether she and boyfriend were going out, later promised to put her up in an apartment if she broke up with her boyfriend, complimented her body and legs and caressed her leg from her knees to her ankle during a one-on-one back-room meeting where supervisor seated them face-to-face at close proximity, was "'always hovering around'" her and "following her," gave her a "'very forceful'" "'body-to-body'" hug lasting "several seconds," and caressed her leg

9

again during another one-on-one back-room meeting during which he complimented her appearance and encouraged her to break up with her boyfriend); *Wal-Mart Stores, Inc. v. Davis*, *supra.* Nonetheless, it must be remembered that the prohibition against sexual harassment serves to provide a remedy when the objectionable conduct rises to a level so extreme and abusive that it deprives the victim of equal opportunity in the workplace. *Twigland Fashions, Ltd. v. Miller*, 335 S.W.3d 206, 222-24 (Tex. App.–Austin 2010, no pet.). And, we find it difficult to hold that such equal opportunity in the workplace exists when females are compelled to endure sexually charged behavior to which males are not exposed.

It must be remembered that Houston directed his comments and conduct toward women, not men. He did not run his fingers down a man's back to his buttocks while the man was bent over. He did not offer to help a male do his job by hugging the male around the waist. He did not invite men to his abode because of their physical appearance. His conduct was based on gender and had rather clear sexual overtones irrespective of what one business owner thought.

And, when the victim of Houston's multiple and unwanted advances was made known to three different male supervisors, their responses did little to stop the "inappropriate" conduct. One laughed at Brown and made light of it with other male employees. And, while another one supposedly demoted Houston back to cook, nothing in his personnel file indicated that the supposed demotion was due to any mistreatment directed towards female co-workers. Nor was there anything in that file memorializing either his instances of "inappropriate" behavior or any discipline related thereto. Instead, one of the men who owned Sonic and knew of Houston's actions was

10

telling a potential employer of Houston that he was a "good worker." At the very least, this contradictory evidence provided jurors rational basis to discredit the testimony of any Sonic representative about their effort to make substantive (or any) change in the environment in which Brown was obligated to work.

Of course, Brown was free to leave, as she eventually did. But, again, a workplace wherein females have to experience or otherwise live with repeated sexual advances to remain an employee or otherwise flourish (when her male counterparts do not) falls short of providing equal opportunity. Consequently, the record contains both legally and factually sufficient evidence to support the findings that 1) Brown labored in a sexually abusive working environment that affected a term, condition or privilege of her employment and 2) Sonic both knew of and failed to take steps to repudiate or eliminate that environment.

We note the various cases Sonic relied on to support its argument that the environment was not sufficiently hostile or abusive. They consist of *Garcia v. Schwab*, 967 S.W.2d 883 (Tex. App.–Corpus Christi 1998, no pet.), *Staller v. Service Corp. Int'l*, No. 04-06-00212-CV, 2006 Tex. App. LEXIS 9130 (Tex. App.–San Antonio, October 25, 2006, no pet.), *Twigland Fashions, Inc. v Miller, supra,* and our opinion in *City of San Antonio v. Cancel*. Yet, each is easily distinguishable from the circumstances before us. In the first three, the employee claimed sexual harassment after being fired. Formal complaints about being sexually harassed were not made before then. This is of import because the employee must establish that the work environment was both objectively and subjectively offensive, that is, one that a reasonable person would find hostile or abusive and one that the victim in fact did perceive it to be so. *Staller v. Service Corp.*

11

*Int'l, supra; City of Houston v. Fletcher*, 166 S.W.3d 479, 489 (Tex. App.–Eastland 2005, pet. denied). Failing to complain hardly illustrates a subjective belief that the workplace is offensive. Furthermore, without the employer being told of any complaint, it is somewhat difficult to show that the employer either knew of them or failed to take remedial action, both of which were elemental to recovery. Moreover, the inappropriate behavior in *Cancel* was not repeated over a period of time. The same cannot be said here, however. Some evidence exists upon which a reasonable juror could find that Brown repeatedly complained to her superiors and that the multiple complaints met with a cavalier or *de minimis* response from the employer.

Instead, the circumstances before us liken more to those in *Dillard Dept. Stores, Inc. v. Gonzales*, 72 S.W.3d 398 (Tex. App.–El Paso 2003, pet. denied), where a finding of sexual harassment was upheld. There, Gonzales' supervisor (Tellez) would come from behind and lean his body over and against the back of Gonzales, hug Gonzales, direct sexual remarks toward him, and, at least once, poke Gonzales in the buttocks with a shoe box. His complaints simply resulted in Tellez being admonished about the conduct. Thereafter, Tellez redirected his behavior towards other male employees. Here, Houston hugged Brown despite being told by Brown that it was offensive, "spooned" with her against her objections, and waited until Brown was bent over to rub her back down to her buttocks. So too did Houston make sexually suggestive remarks about other women. And, while he did not dispute any of the accusations levied against him, Sonic not only retained him as an employee but also told others he was a good one. Simply put, neither *Staller, Garcia, Twigland,* or *Cancel* control the outcome here.

12

*Issue Two--Attorney's Fees*

Sonic next complains of the attorney's fees awarded Brown. Not only does it suggest that they should have been denied her because of her failure to comply with discovery requests inquiring into the matter of fees, but also because permissible fees were not segregated from impermissible ones.

Regarding the first complaint, we note that Brown replied to Sonic's discovery requests by asserting the attorney/client privilege and contending that the information could be secured through easier means. Sonic neither filed a motion to compel disclosure of the information at issue nor otherwise requested a pretrial hearing to assess the legitimacy of the response. Nor did it contend on appeal that the response failed to justify Brown's withholding of discovery. Instead, it simply wants us to exclude all evidence encompassed by the discovery requests. But, because Sonic never challenged the validity of Brown's replies below, we cannot say whether the trial court erred in admitting evidence of the amount of attorney's fees incurred by her. This is so because if the replies were legitimate (an issue we do not decide), Brown was not obligated to provide the information. And, if she was not obligated to provide it, she cannot be punished for failing to provide it. So, Sonic failed to build the requisite foundation upon which we could address its complaint on appeal, and we overrule the issue. *See McKinney v. National Union Fire Insurance Company of Pittsburg, Pennsylvania*, 772 S.W.2d 72, 75 (Tex. 1989) (stating that the party securing discovery has the burden to request a hearing upon the objections urged by his opponent).

As for the dispute regarding whether the fees were properly segregated, it is clear that a prevailing party must segregate recoverable from unrecoverable attorney's

13

fees "in all cases." *Varner v. Cardenas*, 218 S.W.3d 68, 69 (Tex. 2007). Furthermore, "[i]ntertwined facts do not make tort fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313-14 (Tex. 2006). And, when "it cannot be denied that at least some of the attorney's fees are attributable only to claims for which fees are not recoverable, segregation of fees ought to be required and the jury ought to decide the rest." *Id.* at 314. With this in mind we note the absence of any contention that attorney's fees were recoverable for each cause of action pursued by Brown. Rather, she alleged a number of claims sounding in tort and for which attorney's fees were unavailable. Included in such claims were negligence, gross negligence, libel, slander, battery, and retaliation.

Now, one may legitimately conclude that in proving her claim of sexual harassment, Brown may have also established her claim for battery. For instance, proving that Houston touched her in offensive ways not only served to illustrate the presence of an abusive workplace, but also established a battery. *See Price v. Short,* 931 S.W.2d 677, 687 (Tex. App.–Dallas 1996, no writ) (defining battery as an offensive touching). Yet, we are left to wonder how attempting to prove that Brown was libeled or slandered also advanced the sexual harassment allegation. The same is also true of the claims sounding in negligence, negligence *per se*, gross negligence, negligent retention, to name a few. And, when asked whether there was any attempt to segregate fees incurred in relation to the sole claim for which fees were recoverable from the multiple claims for which they were not, the sole witness addressing the matter stated: "[t]here was not. All the time that I spent on this case was time dedicated to the

14

prosecution of certain claims by Plaintiff as a result of certain acts or omissions by [Sonic] . . . .  Those multiple acts or omissions provided the factual basis for every claim . . . Plaintiff raised in her original and amended petitions."  The witness also opined that "there was no way possible to separate times where I would be working on . . . common law claims, but not her statutory Texas Labor Code claims."  Nowhere did the witness explain why this was supposedly true.  Nor did she endeavor to show how prosecuting a "common law" claim necessarily advanced the development of the harassment claim.

As stated earlier, "intertwined facts do not [alone] make tort fees recoverable." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d at 313-14.  Instead, the claimant must illustrate how prosecution of the tort claims also advanced the claim or claims for which the recovery of fees was available to be freed from the burden to segregate.  Brown did not do so here; so, we must remand the issue for further development.  *See id.* at 314 (concluding that because evidence of unsegregated fees constitutes some evidence of an entitlement to segregated fees, remand was required).

### Brown's Appellate Contentions

*Issue One -- Error in not Awarding More Fees*

Brown initially contends that the trial court erred in not awarding her the full amount of attorney's fees she requested.  Given our resolution of Sonic's complaint regarding the segregation of fees and our decision to remand the question of what attorney's fees are actually recoverable, we need not address this issue.

*Issue Two -- Directed Verdict on Claim of Battery*

In her second issue, Brown argues the trial court erred in granting a directed verdict in favor of Sonic on her claim of battery.[2]  Sonic had moved for such on the ground that no evidence supported her effort to render it vicariously responsible for any assaultive conduct committed by Houston.  We overrule the issue.

A directed verdict may be proper when a plaintiff fails to present evidence raising a fact issue regarding an essential element of the plaintiff's claim.  *Prudential Ins. Co. v. Fin. Review Servs., Inc.,* 29 S.W.3d 74, 77 (Tex. 2000).  In reviewing the decision, we credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not.  *See City of Keller v. Wilson,* 168 S.W.3d at 827.

Next, the elements of battery mirror those of criminal assault. *See Johnson v. Davis,* 178 S.W.3d 230, 240 (Tex. App.–Houston [14th Dist.] 2005, pet. denied).  And a person commits an assault if he intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative.  *See* TEX. PENAL CODE ANN. §22.01(a)(3) (Vernon 2011).  Additionally, to render an employer liable for a civil battery by its employee, the purported victim must establish that the act 1) fell within the scope of his general authority, 2) was in furtherance of the employer's business, and 3) was for the accomplishment of the object for which the employee was hired.  *See Robertson Tank Lines, Inc. v. Van Cleave,* 468 S.W.2d 354, 357 (Tex. 1971).  While "'it is not ordinarily within the scope of a servant's authority to commit an assault on a third person,'. . .

------

[2]Brown alleges she was the victim of a battery but acknowledges the elements of a civil battery are the same as an assault under § 22.01(a)(3) of the Texas Penal Code. TEX. PENAL CODE ANN. §22.10(a)(3) (Vernon 2011) (section entitled "assault").  We refer to this claim as assault rather than battery.

16

exceptions may exist where the assault, although not specifically authorized by the employer, is closely connected with the servant's authorized duties, such as where a security guard uses more force than is necessary in protecting the employer's property." *Medina v. Herrera,* 927 S.W.2d 597, 601 (Tex. 1996). Yet, those are not the circumstances present here.

Though Sonic allegedly classified Houston as a "manager-in-training," the extent of his duties was far from developed. While there is some evidence indicating that they included cooking and collecting money from the carhops, there is no evidence that they encompassed the engagement in physical contact with anyone, whether sexual in nature or otherwise. Nor has anyone cited us to evidence explaining what a "manager-in-training" was supposed to do and whether it included any supervisory authority over carhops and the performance of their general duties. While Brown insinuates that it did, her conclusions were not accompanied by any record references. It may well be that a manager-in-training encompassed training to run the entire operation of Sonic. Or it may mean that his duties were limited to supervising the kitchen and collecting money. But, we are not free to guess what they were. And, while a title may sound impressive and authoritative, it is all too true that titles are often little more than a title. Without some evidence that being a manager-in-training obligated Houston to engage in physical contact with or otherwise supervise carhops like Brown, we cannot simply conclude from the title given him that it did. This is especially true given Brown's admission when asked if Houston had "any business trying to tell her how to do her job." She responded: "Not to my knowledge, *no he didn't.*" (Emphasis added).

17

As for the allegation that there was sufficient evidence of ratification to avoid a directed verdict, Brown cites us to evidence of knowledge coupled with inaction. As previously mentioned, a rational jury could have reasonably found that Sonic both knew of and did nothing to stop Houston's objectionable acts. Yet, ratification cannot be inferred from knowledge and inaction alone. *See e.g., Green v. Jackson*, 674 S.W.2d 395, 399-400 (Tex. App.–Amarillo 1984, writ ref'd n.r.e.) (holding that summary judgment on the issue of ratification was appropriate despite the presence of evidence illustrating knowledge of the employee's misconduct and inaction by the employer).

In sum, we reverse that portion of the judgment awarding Brown attorney's fees and remand that issue to the trial court for further proceedings. All other aspects of the judgment are affirmed.

Brian Quinn
Chief Justice

18