**UNITED STATES of America, ex rel. Rebecca GONZALEZ, Plaintiff/Relator,**

v.

**FRESENIUS MEDICAL CARE NORTH AMERICA, et al., Defendants.**

**No. EP–07–CV–247–PRM.**

United States District Court, W.D. Texas, El Paso Division.

March 31, 2010.

---

Mark Dawson Jarmie, Jarmie & Associates, Albuquerque, NM, Mark D. Standridge, Jarmie & Associates, Las Cruces, NM, Thomas E. Stanton, Law Offices of Thomas Stanton, El Paso, TX, for Plaintiff.

A. Kevin Troutman, Stephen J. Roppolo, Fisher & Phillips L.L.P., Houston, TX, Edward L. Dowd, Jr., James F. Bennett, Megan S. Heinsz, St. Louis, MO, James O. Darnell, Jim Darnell, P.C., Richard Andrew Bonner, Kemp Smith LLP, El Paso,

TX, Jennifer L. Aspinall, Dowd Bennett LLP, Clayton, MO, Juanita Rose Brooks, Roger Allen Denning, Fish & Richardson P.C., San Diego, CA, for Defendants.

### MEMORANDUM OPINION IN SUPPORT OF ORDERS GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR JUDGMENT AS A MATTER OF LAW

PHILIP R. MARTINEZ, District Judge.

On February 23, 2010, at the close of evidence in Relator Rebecca Gonzalez's (Relator) case-in-chief, the Court granted in part and denied in part Defendant Fresenius Medical Care North America, et al.'s (Fresenius Defendants)[1] "Motion for Judgment as a Matter of Law" (Docket No. 430), and granted in part and denied in part Defendant Alfonso Chavez's (Chavez) "Motion for Judgment as a Matter of Law" (Docket No. 431) orally on the record, having also considered Relator's "Response to Fresenius' Motion for Judgment as a Matter of Law" (Docket No. 432), Relator's "Response to Alfonso Chavez's Motion for Judgment as a Matter of Law" (Docket No. 440), Relator's "Supplemental Brief Regarding Retaliation Issues" (Docket No. 436), Chavez's "Supplemental Memorandum in Support of Motion for Judgment as a Matter of Law" (Docket No. 437), and Fresenius Defendants' "Supplemental Memorandum in Support of Motion for Judgment as a Matter of Law" (Docket No. 438), as well as all of the testimony and evidence presented during Relator's case and the arguments presented by counsel on the record. The instant memorandum sets forth the Court's analysis regarding the motions for judgment as a matter of law.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

Initially, the Court provides a general summary of the complex set of facts in this case, and will supplement this summary with additional facts as necessary in the subsequent sections. Rebecca Gonzalez, a former Fresenius employee, brought the instant *qui tam* action[2] under the False Claims Act (FCA). She alleged that Chavez, a nephrologist,[3] and Fresenius, a company that provides dialysis services to patients with end stage renal disease (ESRD), submitted false or fraudulent claims[4] to Medicare. *See generally* Fourth Am. Compl. 2, 4–9. Chavez, under contract with Fresenius, served as the medical director and the attending physician at Fresenius's Cliffview and Gateway clinics, located in El Paso, Texas. *Id.* at 7;

---

**1.** The "Fresenius Defendants" include Fresenius Medical Care North America, BioMedical Applications of Texas, Inc., Fresenius Medical Care Holdings, Inc., and Larry Ramirez. "Fresenius Defendants" refers to this group of defendants, including Ramirez, and "Fresenius" refers to Fresenius Medical Care North America, Bio–Medical Applications of Texas, Inc., and Fresenius Medical Care Holdings, Inc. only.

**2.** The *qui tam* provisions of the FCA, found at 31 U.S.C. § 3730 (2009), permit a private citizen to bring a civil action for violations of the FCA in the name of the federal government.

**3.** A nephrologist is a medical specialist in nephrology, the branch of medical science concerned with medical diseases of the kidneys. STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000).

**4.** Because the word "claim" has a particular, statutory meaning in the context of the FCA, the Court will attempt to distinguish references to the Relators legal claims or counts asserted in this action from references to Fresenius's or Chavez's claims for reimbursement for dialysis-related services or medications to Medicare.

Chavez's Answer to Fourth Am. Compl. 5. Relator alleged that two non-physicians, Ramiro Devora and Arturo Orozco (the medical assistants), who worked for Chavez during different time periods relevant to this action (2000 to 2001, and 2005 to 2006, respectively), performed tasks and made patient-care decisions at Fresenius clinics in violation of applicable state and federal regulations. Fourth Am. Compl. 8, 97. Relator further alleged that, because Fresenius permitted the medical assistants to perform work for which Chavez was responsible, Chavez's referral of patients to Fresenius from his private practice for dialysis services violated federal anti-kickback laws. *Id.* at 88–93.

The alleged violations of state and federal regulations resulting from the use of the medical assistants, and the allegedly illegal referral scheme that resulted, as well as an alleged conspiracy to defraud, formed the basis of Relator's FCA theories against Fresenius.[5] *Id.* at 97–106. In addition, Relator alleged that Chavez, through his medical practice Nephrology Associates, falsely billed Medicare for patient visits conducted by one of the assistants. *See id.* at 75, 94, 100.

Fresenius denied that the medical assistants' activities violated applicable regulations, and argued that, in any case, its Medicare claims were not false because Fresenius submitted claims to Medicare for payment for services which were actually provided, and alleged non-compliance with state and federal regulations would not render their claims false for purposes of the FCA. *See generally,* Fresenius's Answer to Fourth Am. Compl. For his part, Chavez denied the allegation that he made false claims to Medicare through his

practice, and asserted that he was indeed present during all patient visits for which he billed. *See generally,* Chavez's Answer to Fourth Am. Compl.; *id.* at 5. Chavez further argued that Devora and Orozco performed their work for him in accordance with law, and that his arrangement with Fresenius, therefore, did not violate anti-kickback laws. *Id.* Finally, both Fresenius and Chavez denied that they conspired to defraud the Government in violation of the FCA. Fresenius's Answer to Fourth Am. Compl. 87; Chavez's Answer to Fourth Am. Compl. 37.

Relator also alleged that Fresenius retaliated against her for engaging in "protected activities" under the False Claims Act by creating a hostile work environment wherein she was harassed, threatened, and discriminated against, and eventually forced to resign. Retaliation Compl. 10–12. Under the same set of facts, Relator alleged that Fresenius and Ramirez are liable for intentional infliction of emotional distress. *Id.* at 12.

### B. Procedural Background

On September 26, 2006, Relator filed a sealed complaint alleging violations of the False Claims Act against Fresenius and Chavez on behalf of the United States of America (the United States, or the Government). On November 21, 2007, the Government informed the Court that it had elected not to intervene in the action. Docket No. 20, Cause No. 06–CV–336–PRM. On December 19, 2007, the Court unsealed the case pursuant to Relator's motion. Docket No. 25, Cause No. 06–CV–336–PRM. Meanwhile, on July 10, 2007, Relator filed a sealed complaint against Fresenius, Chavez, and Larry Ramirez[6] (Ramirez) alleging retaliation un-

---

**5.** Relator alleges that, by submitting claims for reimbursement to Medicare, Defendants falsely certified compliance with the applicable state and federal regulations. Fourth Am. Compl. 12.

**6.** Larry Ramirez has been the manager of the Cliffview clinic since 2006. *See* Relator's Fourth Am. Compl. 83.

der the FCA and various state-law tort claims in a new cause of action. Docket No. 2, Cause No. 07–CV–247–PRM. On December 21, 2007, the Court unsealed the retaliation case pursuant to Relator's motion. Docket No. 13, Cause No. 07–CV–247–PRM. On January 24, 2008, the Court consolidated the two cases in this action, Cause No. 07–CV–247–PRM.[7] Docket No. 18, Cause No. 07–CV–247–PRM; Docket No. 31, Cause No. 06–CV–33 6–PRM.

The Fresenius Defendants and Chavez each filed motions to dismiss. Docket Nos. 26, 36. On September 2, 2008, 2008 WL 4277150, the Court dismissed Relator's common law claims of payment by mistake and unjust enrichment for lack of standing, and Relator's retaliation claims against Ramirez. "Order Granting in Part and Denying in Part Defendants' Motions to Dismiss," Docket No. 64. The parties continued to conduct extensive discovery and filed a number of discovery-related motions, which the Court referred to a United States Magistrate Judge for disposition.

On June 5, 2009, Relator submitted her Fourth Amended Complaint. Docket No. 180. Therein, Relator alleged, in short, that the manner in which Fresenius and Chavez provided dialysis services to their patients—by using two "unlicensed, un[-]credentialed" assistants—rendered their subsequent claims for reimbursement to Medicare "false" or "fraudulent" for purposes of the FCA under seven distinct theories or causes of action. On June 17, 2009 and June 19, 2009, respectively, the Fresenius Defendants and Chavez filed substantively identical motions to dismiss

portions of the Fourth Amended Complaint (Docket Nos. 188, 201), which the Court granted in their entirety on January 21, 2010, 2010 WL 1645969 (Docket No. 408). In granting the motions to dismiss, the Court dismissed two causes of action and imposed a six-year statute of limitations. Docket No. 408. Thus, the following causes of action remained viable at the start of trial for the FCA case against Fresenius and Chavez:

- Count 1: Knowingly presenting fraudulent or false claims in violation of the FCA, 31 § 3729(a)(1) (West 2008);[8]
- Count 2: Knowingly making a false record or statement in presentation of false claims in violation of the FCA, § 3729(a)(2);
- Count 3: Presenting false claims for Medicare reimbursement for services rendered in violation of the Stark Law, 42 U.S.C. § 1395nn;
- Count 6: Presenting false claims for Medicare reimbursement for services rendered in violation of the Anti–Kickback Act, 42 U.S.C. §§ 1320a–7b(b);
- Count 7: Conspiring to submit false claims in violation of the FCA, § 3729(a)(3).

The following causes of action remained viable at the start of trial for the retaliation case:

- Count 1: Retaliation in violation of the FCA, § 3730(h) (as against Fresenius);
- Count 2: Retaliatory constructive discharge in violation of the FCA, § 3730(h) (as against Fresenius);
- Count 3: Intentional infliction of emotional distress (as against Fresenius and Ramirez).

**7.** Hereinafter, all citations to the docket refer to Cause No. 07–CV–247–PRM.

**8.** Congress amended several subsections of the FCA in May, 2009 by enacting the Fraud Enforcement Recovery Act of 2009, Pub. L. No. 111–21, § 386, 123 Stat. 1617 (2009)

[hereinafter FERA]. The Court finds, for the reasons stated in Section III.B.1, *infra,* that the FERA amendments to subsection (a)(2) do not apply to this action. The Court will therefore continue to cite to the former version of the FCA (and its subsection designations) throughout this opinion.

Relator, Fresenius, and Chavez also each filed motions for summary judgment and related evidentiary motions pertaining to certain affidavits and expert testimony. *See* Docket Nos. 125, 155, 156, 161, 190, 224, 228, 257, 320. The Court subsequently excluded the testimony of two of Relator's experts, computational linguist Jason Baldridge and nephrologist Kenneth Kokko, and limited the scope of the testimony of two other experts, Jean Bishop, a specialist on health care fraud, and Peggy Knudsen, a registered nurse and dialysis facility consultant.[9] *See* Trial Record; Docket Nos. 413, 414, 454, 455, 456, 457; Text Orders of Feb. 20, 2010.

On February 1, 2010, a jury having been empaneled, the case proceeded to trial, and Relator presented evidence in support of her claims over the course of three weeks via live testimony, deposition testimony, and voluminous documentary evidence. At the close of Relator's case-in-chief, the Fresenius Defendants and Chavez each filed written motions for judgment as a matter of law on all remaining counts of the FCA and retaliation cases. Docket Nos. 430, 431. After due consideration, the Court granted in part and denied in part the motions for judgment as a matter of law orally on the record, finding the Defendants were entitled to judgment as a matter of law on the following claims:

- Count 1 of the Retaliation Complaint (retaliation in violation of the FCA) as to Fresenius;
- Count 2 of the Retaliation Complaint (retaliatory discharge in violation of the FCA) as to Fresenius;
- Count 3 of the Retaliation Complaint (intentional infliction of emotional distress or IIED) as to Fresenius and Ramirez;[10]
- Count 1 of the FCA Complaint (knowingly presenting fraudulent or false claims in violation of the FCA) as to Fresenius only;
- Count 3 of the FCA Complaint (presenting false claims for reimbursement for services rendered in violation of the Stark Law) as to Fresenius and Chavez;

Count 6 of the FCA Complaint (presenting false claims for reimbursement for services rendered in violation of the Anti–Kickback Act) as to Fresenius and Chavez.

The Court also concluded that, because Fresenius obtained judgment as a matter of law as to Count 1 of the FCA Complaint (knowingly presenting fraudulent or false claims), Fresenius's and Chavez's liability on Count 2 of the FCA Complaint (knowingly making a false record or statement in presentation of false claims) and Count 7 of the FCA Complaint (conspiring to submit false claims) would necessarily be limited to false records or statements made in support of *Chavez's* claims to Medicare, and conspiracy to submit false claims by *Chavez*. In other words, to the extent Relator alleged that Fresenius and Chavez made false records or statements in support of allegedly false claims to Medicare by Fresenius, or that Fresenius and Chavez conspired to submit false claims on behalf of Fresenius, those allegations could not be submitted to the jury. Only false claims by Chavez could support liability for Chavez and Fresenius under the (a)(2) (false records or statements) and (a)(3) (conspiracy) prongs of the FCA.[11]

---

9. Relator also chose not to offer her expert on damages, Henry South, a certified public accountant.

10. Thus, the Fresenius Defendants obtained judgment as a matter of law on Relator's retaliation case in its entirety.

11. *See* Section III.B.4(b), III.B.5(b), *infra*.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 50(a) provides the standard for a motion for judgment as a matter of law:

If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

(A) resolve the issue against the party; and

(B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

FED. R. CIV. P. 50(a).

■■■ "There is no legally sufficient evidentiary basis when 'the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict.'" *Wallace v. Methodist Hosp. System*, 271 F.3d 212, 219 (5th Cir.2001), citing *Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218 F.3d 392, 401 (5th Cir.2000) (internal quotations omitted). "[T]here must be more than a mere scintilla of evidence in the record to render the grant of [judgment as a matter of law] inappropriate." *Id.* "A court should grant a Rule 50(a) motion not only when the non-movant presents no evidence, but also when there is not a sufficient 'conflict in substantial evidence to create a jury question.'" *Travis v. Bd. of Regents of the Univ. of Tex. Sys.*, 122 F.3d 259, 263 (5th Cir.1997), citing *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 804 (5th Cir.1997).

■■■ In evaluating a Rule 50(a) motion, "the court is to view the entire trial record in the light most favorable to the non-movant, drawing all factual inferences in favor of ... the non-moving party, and leaving credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts to the jury." *Conkling v. Turner*, 18 F.3d 1285, 1300 (5th Cir.1994), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The 'decision to grant a directed verdict ... is not a matter of discretion, but a conclusion of law based upon a finding that there is insufficient evidence to create a fact question for the jury.'" *Id.* at 1300–1301, citing *In re Letterman Bros. Energy Sec. Litig.*, 799 F.2d 967, 972 (5th Cir. 1986).

## III. ANALYSIS

### A. Retaliation Case

#### 1. Retaliation & Constructive Discharge

Section 3730 of Title 31 of the United States Code provides a cause of action for retaliation by a "whistleblower" under the False Claims Act:

Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.... An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

31 U.S.C. 3730(h) (West 2008).

In this case, Relator alleged in two separate counts that Fresenius retaliated against her by (1) threatening, harassing,

and discriminating against her in the terms of her employment by isolating her, taking away job duties, hiring new people to take on her duties, and subjecting her to discipline, and (2) effectively forcing her to resign from her position by requiring her to assist in perpetrating Medicare fraud. Retaliation Compl. 10–11. However, Relator presented legally insufficient evidence to establish the essential element of knowledge of her protected activities on the part of her employer Fresenius. Therefore, she is not entitled to reach the jury on the two counts of retaliation under the FCA.

 "The legislative history makes clear that a whistleblower must show the employer had knowledge the employee engaged in 'protected activity.'" *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir.1994) (internal quotations omitted), citing S. Rep. No. 345, 99th Cong., 2d Sess. 35 (1985), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5300. It is insufficient for the relator to show that the employer knew that the whistleblower had concerns about compliance with the law; she must show that the employer was on notice of the distinct possibility of *qui tam* litigation. *Id.* at 952; *see also Sealed Appellant I v. Sealed Appellee I*, 156 Fed. Appx. 630 (5th Cir.2005); *United States ex rel. Gray v. Lockheed Martin Corp.*, No. 05–4201, 2010 WL 672017, at *4 (E.D.La. Feb. 19, 2010).

 Relator failed to present any evidence establishing that anyone at Fresenius knew of her activities or status as a FCA relator. None of the Fresenius employees who allegedly retaliated against Relator were called to testify regarding their knowledge of her activities and intentions, most conspicuously Defendant Larry Ramirez and regional manager Eric Broberg, both singled out in Relator's retaliation complaint. No Fresenius employee who did take the stand testified regarding his or her knowledge of Relator's activities. Relator's testimony did not reveal that she told anyone at Fresenius about her activities related to investigating the fraud, consulting an attorney, or filing the lawsuit. She merely suggested, in an indirect fashion, that she believed that everyone knew.[12] *See* Gonzalez Test.

Relator appeared to rely on evidence that the FCA complaint was "unsealed" on a particular date to establish knowledge on the part of Fresenius. *See* Gonzalez Test., Retaliation Compl. 4. However, the fact that the complaint was unsealed does not in and of itself establish knowledge on the part of the relevant actors at Fresenius, and therefore cannot support the retaliation claims.

The only other evidence that might be construed as supporting the knowledge element of a retaliation claim was a letter written by Relator and directed to "Larry" (presumably Larry Ramirez), dated July 3, 2007. Relator's Ex. 480. The letter states that Relator "will not lie to the Medicare auditors" and "would have to tell them that the medical records were false," and that, in short, she would not continue to work where deceiving Medicare auditors was a condition of employment. *Id.* Yet Relator never called Ramirez to testify at all in her case-in-chief, much less regarding the subject of whether or when he received and read the letter. Relator testified that she did not receive a response to the letter from Ramirez, but only from Human Resources. Gonzalez Test. In addition, according to Relator's testimony, the allegedly harassing and threatening conduct that formed the basis of her legal claim occurred *prior* to the date of the letter. The letter was intended to inform

12. In fact, counsel for Relator admitted during argument that Relator's statement that everyone at Fresenius knew is the only evidence on the element of knowledge.

Ramirez that Relator would not be returning to work, suggesting that the events allegedly forcing her to resign and amounting to constructive discharge had already taken place. In addition, the letter did not adequately put Fresenius on notice of Relator's concerns about the illegality of Fresenius's conduct or the possibility of *qui tam* litigation.

Furthermore, the constructive discharge count in Relator's retaliation complaint rested on the allegation that she was "ordered ... to aid Fresenius in the concealment of the fraudulent billing scheme." Retaliation Compl. 11; *see also* Relator's Ex. 480. However, Relator admitted during cross examination that she was not asked by anyone at Fresenius to falsify documents or lie to Medicare auditors, and that she was not truthful about this issue in her July 3, 2007 letter. Gonzalez Test. Given this admission and the lack of proof concerning Fresenius's knowledge of protected activities prior to the allegedly retaliatory conduct, Relator's claims of retaliation must fail as a matter of law.[13]

## 2. Intentional Infliction of Emotional Distress

■ To reach the jury on her claim for intentional infliction of emotional distress under Texas law, Relator must present substantial evidence that Fresenius and Ramirez: (1) acted intentionally or recklessly; (2) their conduct was extreme and outrageous; (3) their actions caused Relator emotional distress; and (4) the emotional distress was severe. *See Kroger Texas Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 796 (Tex.2006). At trial, Relator failed to present legally sufficient evidence on the second and fourth elements, therefore her claim of intentional infliction of emotional distress should not be presented to a jury.

■ "Meritorious claims for intentional infliction of emotional distress are relatively rare precisely because most human conduct, even that which causes injury to others, cannot be fairly characterized as extreme and outrageous." *Id.* Whether conduct qualifies as "extreme and outrageous" is a question of law. *Bradford v. Vento*, 48 S.W.3d 749, 758 (Tex.2001). To be "extreme and outrageous," conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 611 (Tex.1999). "Texas courts[ ] have adopted a strict approach to intentional infliction of emotional distress claims arising in the workplace," reasoning that "to properly manage its business, an employer must be able to supervise, review, criticize, demote, transfer, and discipline employees." *Id.* at 612.

■ Viewing the trial record in the light most favorable to the Relator, she produced evidence, which a jury would be entitled to believe,[14] that Fresenius or Ra-

---

**13.** In the alternative, the Court notes the overwhelming evidence established on cross-examination that Fresenius had a legitimate basis to take disciplinary action against Relator. She admitted to violating Fresenius policies against theft when she deposited checks from vending machine companies into her personal bank account. Gonzalez Test.; Fresenius's Ex. 842. Relator also admitted that, while on Worker's Compensation, she entered 77 hours of time into Fresenius's computer payroll system in contravention of Fresenius's written policies. Gonzalez Test.; Fresenius's Ex. 835. Both instances of misconduct subjected her to discipline and possible termination. The nature of the evidence on this point was of a degree such that a reasonable juror could not conclude otherwise.

**14.** The evidence to support the IIED claim at trial came from the testimony of Relator Rebecca Gonzalez and documentary proof of disciplinary action.

mirez engaged in the following conduct intentionally: issued a corrective action notice to Relator and suspended her on two or more occasions, took away some of her job duties, gave her job duties to new employees, deactivated her passwords and accounts, prohibited her from speaking with patients, and caused other employees to limit their contact with her. Gonzalez Test.; Relator's Ex. 480, 485. Gonzalez characterized the environment as "horrible."

This conduct, as a matter of law, is far from "extreme and outrageous," particularly in the employment context. Allegations involving similar or more egregious facts have been found not to rise to the level of "extreme and outrageous" conduct by Texas courts. For example, in *Brewerton v. Dalrymple,* the court found the defendants' conduct was not extreme and outrageous where defendants made negative comments that were reflected in plaintiff's file, repeatedly recommended that the plaintiff should not be allowed to continue on tenure track, restricted his speech regarding the contents of his tenure folder, and allegedly assigned him an excessive case load. 997 S.W.2d 212, 216 (Tex.1999). In *City of Houston v. Fletcher,* the plaintiff was, among other things, subjected to daily, humiliating verbal confrontations with her supervisor, loudly berated in front of co-workers, prohibited from taking phone calls though her daughter was sick at home, demoted, and made to perform menial tasks rather than her ordinary job duties. 166 S.W.3d 479, 492 (Tex.App.-Eastland 2005) (pet. denied). The court found this did not constitute "extreme and outrageous" conduct as a matter of law. *Id.* at 492–93. Fresenius and Ramirez's conduct, as represented by the evidence at trial, did not rise to the level of "extreme and outrageous," a critical element of the claim of IIED. Thus, the IIED claim cannot reach a jury and the Fresenius Defen-

dants are entitled to judgment as a matter of law.

 Furthermore, there was no evidence whatsoever that Relator suffered severe emotional distress. "Emotional distress includes all highly unpleasant mental reactions such as embarrassment, fright, horror, grief, shame, humiliation, and worry," while *severe* emotional distress is "distress that is so severe that no reasonable person could be expected to endure it." *GTE Southwest, Inc. v. Bruce,* 998 S.W.2d at 618. Relator testified that the environment was "horrible" and that she did not want to return to work under the conditions that existed. She did not come forward with evidence of emotional or physical distress of any kind following her alleged mistreatment at work. Relator did not show, as a matter of law, that she experienced severe emotional distress.

Relator failed to present legally sufficient evidence to make out a claim for intentional infliction of emotional distress. Her evidence on two critical elements of the claim, (1) extreme and outrageous conduct, and (2) severe emotional distress, was inadequate as a matter of law. Therefore the Fresenius Defendants are entitled to judgment as a matter of law on Relator's claim of IIED.

## B. False Claims Act Case

### 1. No Retroactive Application of the Fraud Enforcement Recovery Act

 Before addressing the legal sufficiency of the evidence presented at trial on the False Claims Act counts of this case, the Court must first set forth its reasons for applying the version of the False Claims Act in effect when this action was filed rather than the amended version currently in force.

On May 20, 2009, the Fraud Enforcement Recovery Act of 2009 (FERA), Pub.L. No. 111–21, § 386, 123 Stat. 1617 (2009), became law. FERA enacts several amendments to the False Claims Act, including changes to the language of the three subsections implicated in this action, that is, § 3729(a)(1), (2), and (3). Section 4(f) of FERA, the "retroactivity provision," states in part:

> The amendments made by this section shall take effect on the date of enactment of this Act and shall apply to conduct on or after the date of enactment, except that—
>
> (1) subparagraph (B) of section 3729(a)(1) of title 31, United States Code, as added by subsection (a)(1), shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. 3729 et seq.) that are pending on or after that date.

FERA § 4(f).

Section 4(f)(1), in citing "subparagraph (B) of section 3729(a)(1)," makes reference to the amendments to former subsection (a)(2). Therefore, it is clear from the first sentence of § 4(f) that the FERA amendments that affect former subsections (a)(1) and (a)(3) went into effect on May 20, 2009, the "date of enactment," and apply to "conduct on or after" that date. In this case, Relator filed the complaint in September, 2006, and the action is focused on conduct of defendants from well before the enactment of FERA. Thus the only question is whether FERA § 4(f)(1) makes the amendments to former subsection (a)(2) retroactively applicable to this action.[15]

The answer lies in the important distinction between "cases" and "claims" in the context of the False Claims Act. Section 4(f)(1) of FERA states that the amended version of (a)(2), now found at § 3729(a)(1)(B), applies to all *claims* under the FCA pending on or after June 7, 2008. The term "claim" is defined in both the pre- and post-FERA versions of the FCA. Before FERA, § 3729(c) defined "claim" was as follows:

> [A]ny request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, guarantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(c) (West 2008).

FERA amended and re-designated that section of the FCA, and "claim" is now statutorily defined as "any request or demand, whether under a contract or otherwise, for money or property ... [that] is presented to an officer, employee, or agent of the United States ...." § 3729(b)(2) (2009). Both definitions of "claim" refer not to cases or causes of action under the FCA, but rather to claims for money or property made to the Government. "Case" is not defined in the FCA. However, Congress did choose to use the word "case," rather than "claim" in § 4(f)(2) (another amendment shall "apply to cases pending on the date of enactment"), indicating that Congress was aware of the distinction and would have used the word "case" in (f)(1) had it intended the amendments to (a)(2) to apply retroactively to pending FCA civil actions rather than pending claims for money or property.

Because "claims" is a particularly-defined term of art under the False *Claims*

---

**15.** The Court requested, and the parties submitted, supplemental briefing on this issue prior to the start of trial. Docket Nos. 398, 402, 403, 404, 406.

Act, the Court must read the reference to "claims" in FERA § 4(f)(1) according to that definition. Therefore, the amendments to (a)(2) apply only to "claims" for payment pending on or after June 7, 2008. The claims for payment by Fresenius and Chavez that are at issue in this case were made between 2000 and 2006, and certainly were not pending on June 7, 2008. Therefore, the Court concludes that the amendments to § 3729(a)(2) do not apply to this action.

The majority of district courts to have ruled on the issue of the retroactive application of the FERA amendments have come to the same conclusion.[16] Similarly, the first appellate court to address the question, the Court of Appeals for the Eleventh Circuit, also interpreted the word "claim" in § 4(f) to mean a request or demand for money or property, per the statutory definition, and did not apply the FERA amendment retroactively. *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1327 n. 3 (11th Cir.2009).

The Court is mindful that Fresenius has argued that retroactive application of the FERA amendments in this case would violate the *ex post facto* clause of the United States Constitution. Fresenius's Supplemental Briefing (Docket No. 402) 5–6; *see*

*also Sanders*, 667 F.Supp.2d at 752–58 (finding, in an alternative holding, that retroactive application of FERA would violate the *ex post facto* clause). To the extent retroactive application raises constitutional concerns, the foregoing interpretation of FERA § 4(f)(1) has the additional benefit of avoiding the constitutional question. *See Clark v. Martinez*, 543 U.S. 371, 381–82, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005) (explaining that the canon of constitutional avoidance "is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts").

### 2. Overview of False Claims Act Counts

Relator alleged and attempted to prove at trial that Fresenius and Chavez each knowingly presented false claims for reimbursement to Medicare in violation of subsection (a)(1) of the FCA under a number of different theories, as outlined below. *See generally* Fourth Am. Compl. Relator also alleged that Fresenius and Chavez each made or used false records or statements to get these false claims paid (a violation of subsection (a)(2)), and that they conspired to defraud the Government

16. *See, e.g., United States ex rel. Compton v. Circle B Enters., Inc.*, No. 7:07–CV–32, 2010 WL 942293, at *2 n. 5 (M.D.Ga. Mar. 11, 2010) ("The revised version of section (a)(1)(B) does not apply to this case because none of Defendants' claims (the ... reimbursement claims) at issue here were pending on or after June 7, 2008."); *United States ex rel. Putnam v. E. Idaho Reg'l Med. Ctr.*, 696 F.Supp.2d 1190, 1196 (D.Idaho 2010) ("[B]ecause the claims for Medicaid reimbursement at issue in this case were neither pending on nor filed after June 7, 2008, the pre-FERA version of § 3729(a)(2) governs ...."); *Mason v. Medline Indus., Inc.*, No. 07–C–5615, 731 F.Supp.2d 730, 735, 2010 WL 653542, at *3 (N.D.Ill. Feb. 18, 2010) ("The court interprets § 4(f)(1) to apply to 'claims' as defined

in the FCA. Accordingly, FERA's amendment does not apply retroactively to this case."); *United States ex rel. Sanders v. Allison Engine Co., Inc.*, 667 F.Supp.2d 747, 752 (S.D.Ohio 2009) ("[T]he clear indication from Congress is that the revised language at issue here is applicable to 'claims' pending on June 7, 2008, and not to 'cases' pending on June 7, 2008. Since the Defendants in this case had no 'claims' pending on June 7, 2008, the retroactivity clause does not apply to them ...."); *United States v. Sci. Applications Int'l Corp.*, 653 F.Supp.2d 87, 107 (D.D.C.2009) ("[S]ection 4(f)(1) will be interpreted to apply to 'claims' as defined in § 3729, that is, requests or demands for money or property. Thus, FERA has no impact on the present action.").

by getting their respective false claims paid (a violation of subsection (a)(3)).

With regard to (a)(1), Relator alleged under one theory (and two counts under the FCA) that Chavez and Fresenius engaged in an illegal referral scheme that violated both the Anti–Kickback Act and the Stark Law, which in turn rendered each and every one of their claims for reimbursement to Medicare during the relevant time periods "false or fraudulent" under a "false certification" theory.

■ The "false certification" theory of FCA liability, relied upon by Relator throughout this action, was explained by the Fifth Circuit in a leading case in this way: when "the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation." *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir.1997). Relator claimed that Fresenius and Chavez certified compliance with the referral statutes *expressly* on their claim forms and cost reports, and, in the alternative, *impliedly* by virtue of the very submission of the claims to the Government (or a fiscal intermediary) alone.

According to Relator, in addition to certifying compliance with the Anti–Kickback Act and Stark Law, Fresenius also falsely certified compliance (expressly and impliedly) with a host of federal and state regulations that govern dialysis facilities. *See* Fourth Am. Compl. 9–18, 59–70. Relator asserted that, as a result of this false certification of regulatory compliance,[17] a large number of Fresenius's claims to Medicare during the relevant periods were "false." This false certification of regulatory compliance forms another theory under (a)(1) as to Fresenius.

As to Chavez, Relator alleged that a large number of Chavez's claims, billed by his wholly-owned medical practice Nephrology Associates, were false because they represented that a given patient had a certain number of "face-to-face" encounters with Chavez,[18] when, in fact, he was not present for one or more of the encounters. Relator alleged that visits with medical assistants Devora and Orozco were counted by Chavez's staff and billed to Medicare as if a visit with Chavez himself had occurred. This legal claim against Chavez rested on a theory that his claims were "factually false" (Chavez "upcoded" in his billing) rather than on a certification theory.

■ At the close of her case and in responding to the motions for judgment as a matter of law, Relator offered an alternative and novel theory under the FCA, that Fresenius's and Chavez's claims were false or fraudulent for purposes of (a)(1) due to a "fraudulent course of conduct" or because they were "grounded in fraud."[19] This theory, which the Court will refer to generally (as others have) as a *"per se* tainted" claims approach[20] under the FCA,

---

**17.** The alleged regulatory violations arose out of the activities of medical assistants Devora and Orozco at the Fresenius clinics.

**18.** It is undisputed that the amount of payment to which Chavez was entitled per month per patient depended on the number of face-to-face encounters he had with the patient. Chavez used one of three "G-codes" on his claims to Medicare that signified one or two encounters, three encounters, or four or more encounters, respectively. *See* Bishop Test.

**19.** This theory was not explicitly pleaded in the Fourth Amended Complaint, but the Court will nevertheless consider it.

**20.** *See, e.g.,* Joan H. Krause, *"Promises to Keep": Health Care Provider and the Civil False Claims Act,* 23 Cardozo L. Rev. 1363, 1392–94 (2002).

relies not on factual falsity or express or implied certification, but rather on the notion that "the delivery of fraudulent care" and "fraudulent medical recordation" by the defendants renders their claims false even though they performed all of the services for which they billed, and even though the claim forms themselves contained accurate information. *See* Relator's Resp. to Fresenius's Mot. for J. as a Matter of Law 21.

### 3. Anti–Kickback Act & Stark Law Counts as to Fresenius & Chavez

The counts of Relator's FCA complaint that relied on a theory of fraud based on the Anti–Kickback Act and Stark Law fail as a matter of law as to both Fresenius and Chavez because the defendants did not make any express certifications of compliance with those statutes, and the so-called "implied certification theory" of liability is not recognized in the Fifth Circuit.

### (a) No Evidence of Express Certification

In *Thompson*, the Fifth Circuit recognized that "claims for services rendered in violation of a statute do not necessarily constitute false or fraudulent claims under the FCA." *Thompson*, 125 F.3d at 902. Rather, a claimant submits a false claim where "he or she falsely certifies compliance" with a statute or regulation, and the government has conditioned payment upon that certification. *Id.* In this case, Relator did not present legally sufficient, admissible evidence that Fresenius and Chavez made any express certifications of compliance with the Anti–Kickback Act, the Stark Law, or other federal and state laws and regulations for that matter.

It is undisputed that Fresenius submitted claims to Medicare through a fiscal intermediary called Trailblazer using electronic claim forms. However, the electronic claim forms contain no certifications whatsoever. Relator's Ex. 547. Relator also introduced Fresenius's annual cost reports from the two clinics for the years 2005 and 2006.[21] Those cost reports contain the following language:

MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL, AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT MAY RESULT.

I hereby certify that I have read the above statement and that I have examined the accompanying cost report prepared by [clinic name; provider name] for the cost report beginning [date] and ending [date], and that to the best of my knowledge and belief, it is a true, correct, and complete statement prepared from the books and records of the Provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services and that the services identified in this cost report were provided in compliance with such laws and regulations.

Relator's Ex. 520, 521, 523, 524.

Arguably,[22] the cost reports contained an express certification of compliance with

---

21. Cost reports from previous years, which did not certify compliance with any statutes or regulations, were not admitted into evidence. Thus, for the years 2000 and 2001 (the Orozco period), Relator presented no evidence of express certifications of compliance

whatsoever, either on claim forms or cost reports.

22. Other courts in the Fifth Circuit have concluded that a general certification of compliance with law such as the one contained in

statutes and regulations, including the referral statutes. However, even if the cost reports satisfied the first element of a false certification theory, that is the certification of compliance itself, Relator presented insufficient evidence of the second element, that the certification was a condition of payment. Only two witnesses testified about the significance of the cost reports. Cesar Del Valle, a Fresenius area manager and regional vice president, testified that cost reports have nothing to do with billing by Fresenius or reimbursement from Medicare, and are not a condition of payment. Del Valle Test. Second, Relator read into the record the summary of a deposition from Robert McGorty, the senior vice president of finance and administration for the Fresenius Medical Services division, which indicated that the cost reports are capable of affecting Fresenius's payment and participation for the following year only, and not the year that they summarize. McGorty Dep. Summ. Relator's experts did not testify about the significance of the cost reports.[23]

Thus, neither the electronic claim forms, nor the cost reports, nor any other document in evidence, contained an express certification of compliance with the referral statutes as a condition of payment by Medicare.[24] Therefore, Fresenius cannot, as a matter of law, be liable under (a)(1) for false claims based on violations of the referral statutes.

Similarly, Relator did not present any evidence of any certification of compliance with the Anti–Kickback Act or Stark Law by Chavez. The claim forms Chavez submitted to the fiscal intermediary for transmission to Medicare were not offered into evidence,[25] nor did any witness testify in detail as to their contents, thus the jury would have no way to determine what

Fresenius's costs reports cannot support a claim for FCA liability. *See United States ex rel. Gudur v. Deloitte Consulting LLP*, 512 F.Supp.2d 920, 947 (S.D.Tex.2007) ("[T]he appropriate inquiry is whether a government claimant has certified compliance with the regulation at issue .... A general statement of adherence to all regulations or statutes governing participation in a program through which federal funds are received is an insufficient basis on which to premise FCA liability.").

23. Furthermore, the Court has not found, and the Relator has not provided the Court citation to, any Medicare regulation indicating that the cost report—or absolute compliance with ESRD regulations for that matter—are conditions of *payment*, rather than conditions of *participation* in the Medicare program. Relator's expert Jean Bishop agreed that the regulations Fresenius allegedly violated were conditions of participation, and that the violation of those regulations by Fresenius would trigger the provisions of a complex remedial scheme under the Medicare regulations rather than the withholding of payment on claims. Bishop Test. Relator failed to demonstrate not only that certification was a condition of payment, but also that absolute regulatory compliance was a condition of payment. *Cf. Thompson v. Columbia/HCA Healthcare*, 20

F.Supp.2d 1017, 1046 (S.D.Tex.1998) (finding, on remand with instructions from the Fifth Circuit, that an affidavit from a former official in the Medicare Program stating that the relevant agency relied on the certifications in question in determining the issues of payment was sufficient to withstand summary judgment).

24. At trial, Relator attempted to show under an alternative theory never before raised in this case that the electronic claim forms incorporated certifications contained in the previously-used, paper version of the form. (It is undisputed that Fresenius did not use paper forms during the periods relevant to this case.) Expert testimony on this issue was struck as outside the scope of the expert's opinions, and the argument that Fresenius "judicially admitted" the contents of the paper form by admitting in its Answer that the Relator had attached the document as an exhibit to her complaint is without merit. The record before the jury contains no evidence of the paper form or its relationship to the electronic claim forms used by Fresenius.

25. The only evidence of Chavez's claims was a collection of remittance forms from Medicare accounting for payments made to Nephrology Associates. Relator's Ex. 455. Relator requested production of the claim forms

certifications, if any, were made by Chavez. Consequently, there was no evidence that any certification was a prerequisite to payment by Medicare.

Therefore, the Court granted the defendants' motions for judgment as a matter of law and withdrew from the jury's consideration the two counts of FCA (a)(1) liability premised on false certification of compliance with the Anti–Kickback Act and Stark Law as to both Fresenius and Chavez.

### (b) Implied Certification Not Recognized in Fifth Circuit

■■■ The Fifth Circuit has repeatedly declined to recognize an "implied certification" theory of False Claims Act liability. In the most recent Fifth Circuit case to raise the issue, *United States ex rel. Marcy v. Rowan Cos., Inc.*, the panel noted that the Fifth Circuit "has previously deferred" the question of whether "implied certifications may be claims under the [False Claims] Act" and chose to "do so again." 520 F.3d 384, 389 (5th Cir.2008); *see also United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 379 (5th Cir.2004) (finding an element satisfied "without resorting to an implied certification theory of liability"); *United States ex rel. Willard v. Humana Health Plan of Tex.*, 336 F.3d 375, 382 (5th Cir.2003) ("This court need not determine here whether it will recognize the 'implied certification' theory . . . .").

from Chavez in discovery, but Chavez was only able to produce the remittance forms, apparently for technical reasons.

**26.** Relator's argument that the decision in *United States ex rel. Longhi v. United States*, 575 F.3d 458 (5th Cir.2009), operates to recognize the implied certification theory of FCA liability is without merit. *Longhi* was a case built on a theory of "fraud in the inducement," not implied certification, and the holding on the materiality standard in that case,

Other district courts in the Fifth Circuit have acknowledged the Fifth Circuit's decision not to recognize an implied certification theory. *See, e.g. United States ex rel. Foster v. Bristol–Myers Squibb Co.*, 587 F.Supp.2d 805, 823 (E.D.Tex.2008) ("The Fifth Circuit has never formally recognized the 'implied certification' theory."); *United States ex rel. Bailey v. Ector County Hosp.*, 386 F.Supp.2d 759, 764 (W.D.Tex.2004) ("The Fifth Circuit has not addressed whether it will recognize the 'implied certification theory.' ").

Given the Fifth Circuit's decision not to recognize an implied certification theory[26] despite having occasions to consider the issue, the Court declines to allow claims premised upon that theory in this action. Thus, the Court concludes that Relator cannot reach the jury on an implied certification theory of FCA liability premised on violations of the Anti–Kickback Act, Stark Law, or federal and state regulations.

### (c) Anti–Kickback Act & Stark Law Violations on the Merits

The Court granted judgment as a matter of law to Fresenius and Chavez on the FCA counts predicated on the referral statutes because of the lack of certifications of compliance, as outlined in the previous sections. However, the Court finds, in the alternative, that Relator presented legally insufficient evidence of violations of the Anti–Kickback Act and the Stark Law[27] to get to a jury.

while important in the Fifth Circuit's FCA jurisprudence, has no bearing on the issues raised in the instant motions for judgment was a matter of law. *See also* Section III. B.4(a), *infra*.

**27.** Indeed, Relator signaled that he agreed there was no basis for the Stark Law count and did not appear to present evidence in support thereof, notwithstanding the Court's clear direction that no legal rulings had been made with respect to that legal claim:

■ In short, the Stark Law "prohibits physicians from referring Medicare patients to an entity for certain 'designated health services'[28] ... if the referring physician has a nonexempt 'financial relationship' with such entity." *Thompson*, 125 F.3d at 902 (citing 42 U.S.C. § 1395nn(a)(1)). It is undisputed that the majority of the patients that received dialysis treatment at the Cliffview and Gateway clinics during the relevant time periods were referred for such treatment by Chavez. Chavez treated patients at his medical practice, Nephrology Associates, or at area hospitals as a nephrologist, and then referred them to Fresenius for dialysis when he deemed it medically appropriate.

However, the services provided by Fresenius and Chavez at issue in this case, namely outpatient dialysis services, are not designated health services and are not covered by the Stark Law. Only the dialysis-related drugs, such as Epogen (or EPO), that Fresenius provided to its patients and billed to Medicare may be covered by Stark as "outpatient prescription drugs."

*See* § 1395nn(h)(6)(J). However, the relevant regulations exempt "EPO and other dialysis-related drugs" from coverage by Stark provided certain criteria are met.[29] Furthermore, the evidence demonstrates that the financial relationship between Fresenius and Chavez falls within an exception to the Stark Law under the regulations for "personal service arrangements."[30] 42 C.F.R § 411.357(d).

■ The Anti–Kickback Act, a criminal statute, prohibits anyone from, among other things, knowingly and willfully soliciting, receiving, offering, or paying any remuneration in return for referring an individual for any item or service for which payment may be made under a federal health care program. 42 U.S.C. § 1320a–7b(b)(1), (2). Thus, the Anti–Kickback Act requires proof that a defendant acted "knowingly and willfully"—criminal intent—in paying remuneration to induce referrals (or receiving remuneration as an inducement to refer). *See United States v. Davis*, 132 F.3d 1092 (5th Cir.1998). Relator did not provide legally sufficient evidence that Fresenius and Chavez knowingly and willfully entered into an illegal referral scheme.[31]

---

Your Honor, at the Court's hearing on the summary judgment, the Court's question to me about designated health services my agreement with the Court that if the Court did not see on summary judgment, would not see here evidence on the designated health services. In my view, it foreclosed me proceeding on the Stark Law, and I think that the Court signaled that at that time.

Fresenius's Mot. for J. as a Matter of Law 20 (quoting counsel for Relator at trial, Feb. 11, 2010).

28. The term "designated health services" includes: clinical laboratory services; physical therapy services; occupational therapy services; radiology services; radiation therapy services and supplies; durable medical equipment and supplies; parenteral and enteral nutrients, equipment, and supplies; prosthetics, orthotics, and prosthetic devices and supplies; home health services; outpatient prescription drugs; inpatient and outpa-

tient hospital services; and outpatient speech-language pathology services. 42 U.S.C. § 1395nn(h)(6).

29. The only criteria at issue is that the arrangement for the furnishing of EPO not violate the Anti–Kickback Act. There is insufficient proof that the arrangement for furnishing EPO in particular violated the Anti–Kickback Act. In fact, Relator's evidence was insufficient to show the criminal intent required under the Anti–Kickback Act in general.

30. Relator attempted to prove that the arrangement for the furnishing of EPO was not exempt from Stark because it violated the Anti–Kickback Act. However, Relator's evidence was insufficient to reach a jury on the Anti–Kickback Act count.

31. Relator attempted to show that, by permitting Devora and Orozco to work in the clinics

### 4. Fresenius's Claims

#### (a) No False Claims by Fresenius under (a)(1)

 Relator did not allege, nor did she come forward with evidence to suggest, that any information contained in Fresenius's electronic claim forms was factually false.[32] No witness or expert identified any information in any claim form that was not factually accurate during Relator's case-in-chief. As explained above, Relator produced no evidence of any express certifications of compliance with statutes and regulations that were a condition of payment,[33] and the implied certification theory is not viable in the Fifth Circuit. Thus, based on the evidence at trial, no reasonable juror could find that Fresenius presented false claims to the Government under any recognized theory.

However, at the Rule 50 stage, Relator put forth a novel theory that Fresenius's claims were false due to the allegedly "fraudulent course of conduct" in the Cliffview and Gateway clinics. Relator pointed to the following language in the recent Fifth Circuit decision in *Longhi* in support

of this *"per se* tainted" approach to FCA liability in this case:

> The Fourth Circuit has concisely stated these various requirements [for FCA liability] in one test, which we adopt today: (1) whether "there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)."

*Longhi*, 575 F.3d at 467 (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008)).

Relator suggested that a defendant's "fraudulent course of conduct," understood in so broad a way as to encompass Fresenius's alleged conduct[34] in this case, can lead to FCA liability where it is capable of influencing the Government's decision to pay. However, this interpretation reads too much into *Longhi.*

In *Longhi*, the Government established, by way of summary judgment evidence, that the defendant had included false

and assist Chavez with his duties, Fresenius provided Chavez with remuneration in exchange for referral of patients. Based on the evidence at trial, in the light most favorable to the Relator, the jury would be entitled to believe that Chavez received a benefit. But Relator did not present any witness or document that would promote the inference of criminal intent to induce referrals. Furthermore, the evidence showed that Chavez's volume of referrals remained constant during the period of time when a medical assistant was working in the clinic and when one was not.

**32.** In fact, the electronic claim forms for the Orozco period (2000–2001) are not in evidence, nor is any substitute document or testimony about them, so the jury has no evidence upon which to determine that any false claims were submitted during that period.

**33.** During argument on the Rule 50 motions, Relator suggested that Exhibit 411, a 1994 Fresenius application to participate in the

Medicare program, contained a certification that could serve as the basis for the false certification theory. This certification argument was not pleaded, and in any case is without merit. The certification does not certify compliance with any statutes or regulations, and there was no evidence that the form was a precondition of payment (rather than participation) for Fresenius's claims for reimbursement in 2000–2001 and 2005–2006.

**34.** Relator alleges the fraudulent conduct included, among other things, fraudulent medical record-keeping to conceal the activities of medical assistants. Specifically, Relator attempted to prove that Devora and Orozco made independent medical judgments, outside their scope of practice, regarding patient care and placed transcribed dictations and other notations in patient files without signing their names, thus concealing their work.

statements in grant proposals submitted to the Department of Defense. *Longhi,* 575 F.3d at 470–72. The Department of Defense awarded the defendant grants on the basis of the false statements, and paid money for work the defendant subsequently performed. *Id.* The Fifth Circuit found a violation of the FCA under the test it announced, but first noted the long-standing principle that, "[i]n certain cases, FCA liability may be imposed 'when the contract under which payment is made was procured by fraud.'" *Id.* at 467–68, citing *Willard,* 336 F.3d at 384. The phrase "fraudulent course of conduct" in *Longhi* referred to the misrepresentations made to the Department of Defense to induce the grant award.[35]

By contrast, in the instant case, Relator did not allege fraudulent inducement. She did not assert in her complaint that Fresenius made false statements to induce the Government to allow Fresenius to participate in the Medicare program. Because *Longhi* is limited to the fraudulent inducement context, it is inapplicable in this case and cannot support an alternative theory of (a)(1) liability as to Fresenius.

Given the insufficiency of the evidence on an express certification theory, and because the implied certification and *"per se* tainted" theories are not viable in the Fifth Circuit, Relator could not reach the jury on Fresenius's allegedly false claims.

### (b) No (a)(2) or (a)(3) Liability Based on Fresenius False Claims

■ Once the Court determined that Fresenius's claims to Medicare were not

false under (a)(1) as a matter of law, it followed that the remaining FCA counts under (a)(2) (false records or statements) and (a)(3) (conspiracy) based on false claims submitted by *Fresenius* could not reach the jury. This conclusion follows from the statutory language, relevant Fifth Circuit authority, and the purposes of the False Claims Act.

Section (a)(2) states that a defendant is liable if it "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." § 3729(a)(2) (emphasis added). Section (a)(3) imposes liability on those who "conspire[ ] to defraud the Government by getting a false or fraudulent claim allowed or paid." § 3729(a)(3) (emphasis added). The use of some form of the verbs "to get" and "to pay" in each of these subsections strongly suggests a requirement of a false claim actually being paid by the Government for liability to attach.

Indeed, the Fifth Circuit in *United States v. Southland Management Corp.* articulated this principle clearly:

> Although § 3729(a)(2) prohibits the submission of a false record or statement, it does so only when the submission of the record or statement was done in an attempt to get a false claim paid. There is no liability under this Act for a false statement unless it is used to get a false claim paid.

---

**35.** Relator's contention that the Fifth Circuit's materiality test as announced in *Longhi* means that any fraudulent conduct can support FCA liability is unsupported. Under *Longhi,* the materiality element of a FCA case requires that the relator demonstrate that the "false or fraudulent statements either (1) make the government prone to a particular impression, thereby producing some sort of effect, or (2) have the ability to effect the

government's actions." *Longhi,* 575 F.3d at 470. This does not mark a dramatic shift in FCA precedent such that a relator can now establish FCA liability by showing underlying fraudulent activity rather than an actual false claim. Rather, *Longhi* establishes the principle that facts demonstrating fraudulent inducement—a theory long-accepted in the Fifth Circuit—can meet the clarified materiality test.

326 F.3d 669, 675 (5th Cir.2003) (en banc); *see also Willard*, 336 F.3d at 380–81 (affirming the district court's finding that, "[u]nder section 3729(a)(2), the plaintiff must identify both a false claim and a false record or statement made or used to get that false claim paid"); *Thompson*, 125 F.3d at 903 (instructing the district court to consider the false statements prong *if* it determined the relator properly alleged false claims).

The Court is mindful that there is some contrary authority on this point. In *United States ex rel. Grubbs v. Kanneganti*, the Fifth Circuit found that "the recording of a false record, when it is made with the requisite intent, is enough to satisfy [ (a)(2) ]; we need not make the step of inferring that the record actually caused a claim to be presented to the Government." 565 F.3d 180, 193 (5th Cir.2009). The panel then applied the same rationale to (a)(3). *Id.* The Court agrees with the view that a defendant company charged with violating (a)(2) need not have actually submitted the false claim *itself*, but rather that *someone* must have submitted a false claim. Indeed, the Fifth Circuit's statement in *Grubbs* might be read to mean just that.[36] In any case, to the extent that *Grubbs* conflicts with *Southland Management* (as well as *Willard* and *Thompson* ), the Court is bound by the clear holding of *Southland Management*.[37] *See Camacho v. Tex. Workforce Comm'n*, 445 F.3d 407 (5th Cir.2006) (stating the rule that "the earliest of conflicting panel decisions controls").

The reasoning of *Southland Management* is bolstered by the careful analysis in a recent decision by the Eleventh Circuit. In *Hopper*, the Eleventh Circuit squarely addressed the question of whether the payment of a false claim is required for (a)(2) liability, and determined it was. 525 F.3d 439. The court reiterated the well-established principle that the submission of a false claim is the *sine qua non* of a False Claims Act violation. *Id.* at 1328. It went on to examine the statutory language, finding the phrase "paid or approved by the Government" in (a)(2) to suggest that Congress intended to impose liability only where false statements actually cause the submission of claims to the Government for amounts it does not owe. *Id.* The Sixth Circuit is in agreement with *Hopper* and *Southland Management. United States ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 447 (6th Cir.2008) (noting that the Sixth Circuit has "repeatedly held that proof of a false claim is required" for (a)(2) and (a)(3) and citing several cases). The Court thus concludes, based on its review of the statutory language and relevant authority, that (a)(2) and (a)(3) require proof that the Government paid a false claim.

The Court has found that Relator presented insufficient evidence of false claims by Fresenius as a matter of law. As a consequence of this finding, the Court was obligated to withdraw from the jury's consideration legal claims under (a)(2) and (a)(3)—the making of false records or

---

**36.** That is, one might read the statement in *Grubbs* to mean that a defendant that makes a false record or statement need not *personally* cause a claim to be presented to the Government, on its own behalf. Instead, (a)(2) liability may attach where the defendant's false record is used by another party in the course of getting its false claims paid. *See Hopper*, 588 F.3d at 1327 (finding that "(a)(2) does not demand proof that the defendant presented or caused to be presented a false claim to the

government" but does require that "the defendant's false record or statement caused the government to actually pay a false claim, either to the defendant itself, or to a third party").

**37.** The Court notes in particular that *Southland Management* was a decision of the Fifth Circuit sitting en banc, and *Grubbs* was a subsequent panel decision.

statements to get a false claim paid and conspiracy to get false claims paid—based upon false claims by Fresenius.

### 5. Chavez's Claims

#### (a) Question of Fact on (a)(1)

■ Although Relator did not present legally sufficient evidence under a certification theory for (a)(1) liability for Chavez based upon violations of the referral statutes, there was sufficient evidence of factual falsity to permit a jury to decide the fact question. A reasonable juror could believe, based on the voluminous documentary evidence and testimony at trial, that Chavez billed Medicare using G-codes for Devora and Orozco's patient visits.

#### (b) Question of Fact on (a)(2) and (a)(3) for Chavez's False Claims

■ If the jury were to find Chavez submitted false claims under (a)(1), there would also be enough evidence upon which it could find that Chavez and/or Fresenius made, used, or caused to be made or used a false record or statement to get Chavez's false claims paid under (a)(2). The Fifth Circuit and the Supreme Court have been clear that "presentment" is not required under (a)(2). *See Grubbs*, 565 F.3d at 192–93. That is, the false record or statement itself need not be submitted to the Government. In addition, a defendant can be liable under (a)(2) for supporting another entity's false claims with false records or statements. Further, because the jury could find Chavez made false claims to Medicare, it could also find based on the evidence presented at trial that Chavez and Fresenius conspired to defraud the Government by getting Chavez's false claim paid. In sum, Chavez's allegedly false claims provided the "hook" for (a)(2) and (a)(3) liability for both Chavez and Fresenius as required under *Southland Management*, and allowed those questions of fact to reach the jury.

## IV. CONCLUSION

For the foregoing reasons, the Court granted in part and denied in part the Fresenius Defendants' "Motion for Judgment as a Matter of Law" (Docket No. 430), and granted in part and denied in part Chavez's "Motion for Judgment as a Matter of Law" (Docket No. 431).